Freedman, J.
This case presents so many interesting questions, and the authorities cited and relied upon by the learned counsel for the parties are so numerous, that owing to the short period I had for their examination, the result of my examination must be announced briefly and without much elaboration.
The action is brought by the plaintiff as owner of the fee, since 1874, of premises situated on the northwesterly corner of Hudson and Laight streets, in the city of New York, to recover damages sustained by reason of the closing of St. John’s Park, the erection of a freight depot thereon, the construction and con- *128 tinned existence of a steam railroad, through Hudson street, the operation of the railroad, and the manner of its operation.
In 1797 the corporation known by. the title of “ The Rector and Inhabitants of the City of New York in communion with the Protestant Episcopal Church in the State of New York” (which for convenience sake I shall hereafter style the corporation of Trinity Church), as owner in fee simple of a large tract of land in- that vicinity, caused a map to be made of its property, on which St. John’s Park appears under the name of Hudson square. In 1803 the said square seems to have been set apart by the corporation as a private ornamental park or square for the benefit of the persons who had leased or should lease from Trinity Church adjacent lots of land directly fronting towards the said park or square on each side thereof/* The lessees of *129 such adjacent lots subsequently acquired title to their respective lots by purchase from Trinity Church. The owners of all other lots in the vicinity though they, *130 also, derived their title from Trinity Church, were to have no right or claim to the continuance of the park or square as such.
*131 The park or square extended to the east side of Hudson street, from Beach street on the south, to Laight street on the north. The premises in suit are situated on the northwesterly corner of Hudson and *132 Laight streets. They therefore never fronted towards the said park or square, and neither under the arrangement pursuant to which in 1803, the park or square seems to have been set apart, nor under the declaration *133 of trust executed by Trinity Church in 1827, had they the right or easement attached to them that the park or square should be continued and preserved as such. By deed of March 2, 1867, Trinity Church, with the *134 assents of the requisite number of adjacent owners, whose lots fronted towards the park or square, and in consideration of the sum of one million dollars, conveyed, as it lawfully could do, the said park or square *135 to the Hudson River R. R. Co. The description of that deed by legal construction conveyed the fee to the center of the streets by which the park or square was bounded, but as matter of fact the fee of said streets *136 had already been ceded by Trinity Church to the Corporation of the city of New York in trust for the use of the public.
The freight depot erected by the Hudson River R. *137 E. Co., covers the whole area, formerly occupied by the park or square. But of this the plaintiff cannot, under the circumstances stated, complain. He is bound to show an easement in the park or square, either by express grant or by dedication. In either case the burden of proof is upon him. He showed no express grant. Now, before the law will, in the absence of an express grant, protect a mere right to a prospect or air over land separated from the plaintiff’s premises by an intervening street, which is all the plaintiff’s claim as to the park or square amounts to, it • must appear affirmatively that the prospect and the air were within the contemplation of the original parties as objects of the dedication. There is no proof that the park or square was ever dedicated to the use of the public in general. Upon the plaintiff’s own showing it was not. Nor do the1 mere facts that Trinity Church in 1797 had a map made of its property, which, among other parcels, contained a tract marked Hudson square, and that in 1805 one of plaintiff’s predecessors in title purchased from Trinity Church the premises in suit as a lot bearing.a certain number on said map, establish that one of the objects for which the square was marked out was to secure to the lot sold a .prospect and the passage of air over the square. The cases cited by the plaintiff in support of such a claim are all cases in which the dedication of the park or square was *138 either made for the use of the public in general, or held out as an inducement to buyers. In the case at bar, there is not only no proof of such an element, but the numbering of the lots on the map itself, and the action of Trinity Church in 1803, speak against it.
The plaintiff has therefore no claim by reason'of the discontinuance of the park or square, or the erection or the mere maintenance of a freight depot thereon.
The next question is, whether the plaintiff has a cause of action by reason of the building of the railroad.
In 1846 the Legislature of the State of New York duly passed an act for the construction of a railroad from New York to Albany, under which, and the acts amendatory thereof, the Hudson River Railroad Company was organized and the road built and operated until 1869, when a consolidation took place between the Hudson River Railroad Company and the New York Central Railroad Company, pursuant to which the company which is the defendant at bar was formed, and by which the operation of the road passed into the hands of the defendant. So far as the consent of the city was necessary for the building and the operation of the road within the limits of the city, it was duly given. This has heretofore been expressly decided.
But neither the action of the Legislature nor that of the city, nor the joint action of both, could divest any of the predecessors in title of the plaintiff of any vested right in the premises in suit or appurtenant thereto. This brings me to the consideration of the question as to what rights, as against the railroad company, such predecessor in title had in and to Hudson and Laight streets.
In 1849, when the railroad company attempted to lay its rails south of Canal street, a number of owners of real "estate fronting upon Hudson street and other *139 streets, applied for an injunction restraining the company from laying any rails from the northerly line of Canal street and West street, through Canal and Hudson streets, to Chambers street. In the course of that litigation, reported under the title of Drake v. Hudson River R. R. Co., in 7 Barb. 508, it appeared that the parts of Hudson and Laight streets, with which we are at present concerned, were originally laid out by Trinity Church as owner of the fee of the land, and the surrounding lands as streets, and dedicated to the public in general as such, and thereafter, in 1813, conveyed to the city in trust that the same should be kept open as streets for the use of the citizens of said city forever. The general term of the supreme court after full examination of all the facts, deemed it unnecessary to determine whether the plaintiffs owned the fee of the soil of the streets, inasmuch as the land comprised within the limits of the streets, had been dedicated by Trinity Church to the public for the purposes of streets before any conveyances of lots were executed to any one. It was expressly decided, however, that the city had full authority to regulate the public uses to which said streets could be put; that the construction of the railroad through Hudson street, of itself, infringed no private rights, provided the passage over the streets was substantially left free and unobstructed ; that in such case, no private property was taken for public use without compensation, within the meaning1 of the constitutional prohibition ; and that, for the reasons stated, no injunction could be issued or maintained. At the same time the rights of abutting owners and of the public were clearly defined, and their right of action for damages in certain contingencies affirmed. But of these matters I shall speak hereafter.
The points stated as having been expressly decided have remained good law ever since. The cases cited by *140 the plaintiff contain no decision to the contrary, and in every case in which in the course of the reasoning a dictum appears which seems to be in conflict, it will be found that additional facts were involved—such as, for instance, a material change in the grade of the street, an excavation or permanent obstruction. Nor were the said points so decided, shaken by the decisions in the elevated railroad cases, for these were placed upon the ground that the permanent structure of an elevated road, of the size and height it was made to appear, occupies so much of the street and interferes so much with the ordinary uses of the street, and is so inconsistent with such uses, as. to work a destruction pro tanto of the easement which every abutting owner has as an appurtenance to his land, to light and air, and ingress and egress, and that such destruction amounts to a taking of property.
The decision in Drake v. Hudson River R. R. Co. is fatal, therefore, to the claim advanced by the plaintiff for damages by reason of the construction and continuous existence or maintenance of the road.
Aside from the reasons already stated, there are others equally fatal to plaintiff’s claim for damages in so far as it is founded upon the erection of the depot in place of the park or square and the construction of the road. These matters, in so far as they may be considered as obstructions, if they are such, constitute permanent obstructions, and if there was an easement in or to the park or square, or if the predecessors in title of the plaintiff owned the fee of the soil in Hudson street to the center of the street, the creation of the permanent obstructions immediately gave a claim for damages which, under the decision in Van Zandt v. Mayor, &c. (8 Bosw. 375), became vested as a chose in action in the then owner of the fee, and subsequently passed to the personal representatives of such owner. The present plaintiff, who acquired title *141 by devise in 1874, has no title to such claim, if it ever existed. Moreover it is barred by the statute of limitations.
The plaintiff’s claim has now been reduced to & claim arising out of the continued operation of the road, the manner in which since 1874 it was operated, and the manner in which defendant’s business was conducted during the same period in the immediate vicinity of plaintiff’s premises.
As the owner of property bounded by Hudson and. Laight streets, the plaintiff has rights in said streets, and an interest in the maintenance of them in their integrity ; but such right and interest consist merely in the use, benefit and enjoyment of them as public streets or highways for the legitimate uses and purposes of streets, and he has no private or exclusive right to, or property in, the use or enjoyment of them. All other citizens have an equal right with Mm to the use of them, even if he should own the fee of the soil to the center of the street, because the fee would be subject to the right of the public to travel over the surface of the street, and to have the street continued forever as a public street. And the railroad company, as part of that public, it has been held in Drake v. Hudson River R. R. Co. (supra), has the same right, in common with others, to use the surface of the same, under the rules and regulations prescribed by the proper authority, for the purposes to which the lands forming the streets were dedicated to the public. Since that decision, it is true, the power of the mayor and the common council of the city of New York to grant such privilege to a railroad company has been very much restricted by legislative enactments, and the power of the legislature itself has been restricted by constitutional amendments. But these changes of power do not affect the case at bar, because they have no retroactive effect.
*142 A railroad having lawful warrant for its existence and operation cannot be a nuisance per se. Nor is the use of a street in a city for the purposes of a railroad, in a manner which does not materially abridge or obstruct the right of passage and repassage for other purposes, such an exclusive appropriation of the street as to amount to a nuisance or a purpresture. In these respects no distinction exists between steam and horse railroads. True, a steam railroad is more apt to become a nuisance than a horse railroad. But whenever it does so in the use of the mere surface of a street, the nuisance arises from the manner in which and^the extent to which it is operated to the exclusion of the proper and ordinary uses of the street. The fact is, that either may become a nuisance by an abuse of the public streets. It requires but little elaboration to demonstrate these propositions.
As was said in Drake v. Hudson River R. R. Co. {supra), a leading use and purpose of a public street is for travelers and others to pass and repass over the same, with horses, carriages, and other vehicles, and on foot. All parties must concur in that definition as applicable to the right of way over the public streets of the city. Now, does not the railroad, with its cars propelled by the application of steam or by animal power, come equally within the definition, as the cart, carriage or omnibus drawn by animals % It is a new mode of using the street, but it is still a use of it for passing and íepassing through it, whether freight or passengers or both are transported. The law-making power, in the absence of constitutional restrictions, has authority to regulate the use of the highways by every species of carriage whether already known or susceptible of introduction on the highways, and the rule is well settled that the diminution to a moderate extent of the accommodation of the public for the better accommodation of a larger portion of the public, does not involve the *143 invasion of public or private right. Those who ride in their own carriages, or whose business may be affected by the laying of rails in the street, are a minority.' The railroad is a part of the history of the times, and' when properly conducted, a great public benefit. The greater portion of the community are accommodated and benefited in various ways by it, and the fact that a small number of people are inconvenienced, does not constitute the road a nuisance.
For these reasons it has been held, that a railroad company, having lawful warrant for its existence and operation, may as incidental to the right of transit, run trains through the streets of a city, establish a turnout so as to communicate with a station on the street, use the street for shifting cars and making up trains, and even stop its cars on the street to unload them.
But all the cases recognize the principle that any or all these things,, must be done at a time and in a manner which is reasonable under all the circumstances. As long as that is the case the railroad company is not liable in damages to any one ; and even the fact that, at such intervals, the owner in fee of a public street is prevented from loading and unloading wagons in front of his store would not constitute special damage. This has been held in Hobart v. Milwaukee City R. R. Co. (27 Wisc. 194; 9 Am. R. 461).
So, it is a well settled principle of law that the conduct of any business, intrinsically lawful, may give rise to a cause of action if, under all the circumstances, it occasions an unreasonable encroachment on the public highway. Thus, in Rex v. Jones (3 Campb. 230), Lord Ellenbobough said: “A cart or wagon may be unloaded at a gateway, but this must be done with promptness. The defendant is not to eke out the inconvenience of his own premises by taking the public highway into his timber yard ; and if the street be too *144 narrow he must remove to a more commodious situation for carrying on his business.”
In The King v. Russell (6 East, 426) it was held that if the nature of the defendant’s business were such as to require the loading and unloading of so many more wagons than could be done conveniently within his own private premises, he must either enlarge Ms premises, or move his business to a more convenient spot. And in Moore v. Jackson (2 Abb. N. C. 211), it was held that a systematic and continued encroachment on a highway, though for the purpose of carrying on a lawful business, is unjustifiable.
The same principle applies to the' operation of railroads through the streets of a city of which the company does not own the fee. For a railroad, though having lawful warrant from the public authorities for its existence and operation, may be so operated as to destroy the right of an abutting owner to the use and enjoyment of the street. Trains on a steam railroad may be run in such numbers and in such rapid succession, by day and by night, and in such close proximity to an abutting owner’s premises, as to render the street at all times impassable for him, except perhaps on foot. A side track on a horse-car railroad may be so close to an abutting owner’s premises as to cut off all access to such premises while incumbered for days and weeks with a row of cars not in ordinary use. The moment, therefore, that the operation of a railroad or the manner of its use becomes under all the circumstances of a case unreasonable as to a particular individual, and special damage ensues in consequence thereof, the operation of the road or the manner of its use, though the road has lawful public authority for its existence and operation by which it is protected from being presented as a public nuisance, becomes, as to the individual so injured, a private nuisance, and he may maintain an action for *145 the special damage. And in the case of a continuing trespass causing continuous injury, the authorities are to the effect that successive actions may be brought year after year so long as grass grows and water runs.
I have, so far, discussed only the right of an abutting owner to the use of the street and to access to and egress from his premises bounded by the street. Under the decision of the court of appeals, in Story v. N. Y. Elevated Railroad Co. {supra), such owner’s right to light and air from the street stands upon the same footing. A load of manure or raw hides may be carted past Ms premises and the smell enter Ms house. For that he is without remedy In the law. For the same reason he has no cause of action by reason of the escape of smoke, gas or cinders from the passing locomotives of a road in lawful existence and operation, provided the occurrences do not exceed a reasonable extent. So any passing object may temporarily darken certain rooms. Against this the owner has no remedy. It is his privilege, in the pursuit of a lawful business and for a necessary purpose, to do the same to Ms neighbor. But a row of cars, not in immediate use, may be so placed against certain of Ms windows, and kept in such position for such a length of time, as to materially interfere with the enjoyment of certain rooms, and for this the law would afford him redress.
The principle deducible from what has been said, and from many cases that might be cited, is that the law of the-public street of a city is motion ;* that any use of a street, though a new one, which does not materially abridge or obstruct the right of passage and repassage, of ingress and egress, and to light and air of the abutting owner, gives no cause of action ; but *146 that every unnecessary material abridgement or obstruction, though of a temporary character, and every continuous material abridgement or obstruction, though made in the pursuit of a lawful business, and to some extent called for by circumstances arising' in the course of such pursuit, by which the right of an abutting owner to pass and repass, to have free access to and egress from his premises, and to enjoy the light and air from the street, is unreasonably affected, gives to the injured party, in case of special damage therefrom, a right of action against the offending party for the recovery of the damages actually sustained; and finally that, in order to determine any such question, each case must be disposed of on its own facts and circumstances.
The principle thus evolved applies to all infringements of, and obstructions in,, the streets of a city, irrespective of their nature and of the persons by whom they are caused.
The law being as stated, the plaintiff upon the proofs now before the court and such additional proofs as he has offered to give and may properly give upon the issues as now restricted, has the right to have his case submitted to the jury.
The rule of damage is the impairment of the rental value of the premises, from the year 1874, to the time of the commencement of the action, and the impairment must be determined with reference to the condition, in which the premises were in that year, and with reference to the uses for which the premises were then rented or to which they could have been put in the condition they were in.
The motion to dismiss was therefore denied.
II. Charge to the jury.
After the evidence adduced on both sides, the learned judge instructed the jury as follows :
*147 Freedman, J.
J. — Gentlemen".—The claim of the plaintiff, as owner of the premises situated on the northwest corner of Hudson and Laight streets, to recover damages for the closing of St. Johns Park, the erection of a freight depot thereon, and for the construction and maintenance of a steam railroad on and through Hudson street, having been disposed of as matter of law, the only cause of action left, with which you have any concern, arises from the operation of defendant’s railroad and the manner of its use. In determining that issue you must start with the proposition that the road was lawfully built, the freight depot extending from Laight street south to Beach street on the easterly side of Hudson street lawfully erected, and that the defendant had lawful warrant from the public authorities to operate the road, and in the course of the operation to use dummy engines, to draw cars between the several passengers, and freight stations of the road in the city of New York. As incidental to these rights, the road, upon the evidence in the case, must be deemed to have possessed the right to maintain and operate the necessary switches and turnouts and curves, and. side-tracks leading into the freight depot, and to use part of Hudson street, for shifting cars and breaking up and making up trains, and even loading or unloading some cars in case of special necessity. To this extent the road is protected by the law from being considered as a public nuisance.
But as against the plaintiff as an abutting owner, this, of itself, is not a complete answer. He also had rights in Hudson street. Whether he owns or owned the fee of the soil to the center of that street, subject to the easement, of the public to travel over it, or only an easement in and to the use of the street as a public street, it is not necessary to determine with precision. In either case he had the right to travel over the street, and to have free access to, and egress from, his *148 premises, and to enjoy the light and air from the public street, subject only to the right of the public to use and enjoy the street as a public highway for the legitimate uses and purposes of a public highway. This qualified right of the plaintiff, the railroad company was bound to respect, and no action of the legislature or of the authorities of the city, nor the joint action of both, could absolve it from the duty. For the right of the railroad company to use, without compensation to abutting owners, a public street of the city, rests upon the theory that the railroad company is part of the public, and that the- use of a public street for the purposes of a railroad, though a new use, is not one which, of itself, is inconsistent with the proper and legitimate uses of the street by the public at large.
As between the plaintiff and the railroad company, therefore, their rights were to a certain extent mutual. Both parties constituted part of the public. The consequence is, that as against the plaintiff the operation and use of the road could be carried only to an extent which, in view of what I have said, was reasonable under all the circumstances. As long as this limit was not exceeded, the plaintiff is without redress, and the defendant is entitled to your verdict. If the limit was exceeded, the operation and use of the road, constituted as against the plaintiff, a private nuisance, to that extent, and if the plaintiff sustained special damage thereby, he is entitled to recover such damages.
To be more specific, the rule which you are to apply to the facts and circumstances of this case, is as follows, viz.; For any use by the railroad company of the streets in the vicinity of plaintiff’s premises, which did not materially abridge or obstruct the right of passage and repassage, of ingress and egress, and to light and air, of the plaintiff and his tenants, and especially for everything that was necessarily incidental *149 to the right of the proper passage of the trains, whether it was noise, or smoke, or gas, or vibration of of the walls, the plaintiff has no cause of action.
But for every material abridgment or obstruction beyond that, though of a temporary character, which was not necessary to the proper lawful prosecution of defendant’s business; and for every continuous material abridgment or obstruction of Hudson street, which was inconsistent with the legitimate uses of the street as a thoroughfare for the public in general, though made in the pursuit of the defendant’s lawful business and to some extent, called for by the exigencies of that business by which the right of the plaintiff and Ms tenants to pass and repass, to' have free access to and egress from the premises, and to enjoy the light and air from the street, was unreasonably affected, the plaintiff may recover, provided he has shown special damage therefrom.
The rules of damage is, the impairment of the rental value of the premises from the year 1874, when the plaintiff became the owner, to the commencement of the action in 1880, and the impairment must be determined with reference to the condition in which the premises were in 1874, and with reference to the uses for which the premises were then rented or to which they could have been put in the condition they were in, but for the excessive exercise, if there was any, of defendant’s business. But before any such special damage can be recovered, it must appear affirmatively that it was directly and wholly caused by some act on the part of the defendant, which within the rules already laid down was actionable, if accompanied by special damage.
I have given you now, in general outline, the essentials which the plaintiff must establish, before he can recover. The burden of proof is upon him throughout, and he must establish a case within the rules laid down *150 by me, by a preponderance of evidence. If upon any point constituting a link in his chain of evidence, which, under the rules laid down by me, is material to his cause of action, he presents merely an evenly balanced case, the defendant is entitled to your verdict.
And especially must I caution you to see to it, that every damage you may wish to award compensation for, is proved to have been the direct and natural result of some act on the part of the defendant which, within the rules laid down by me, was actionable if accompanied by special damage. The testimony discloses many causes which may have co-operated. When Trinity Church, with the consent of the owners of the lots fronting on St. John’s Park, on the four sides thereof, in 1867, conveyed the said park to the defendant, and it became known that a freight depot was to be erected thereon, it was but natural that all who had valued that vicinity as a choice locality on account of the existence of the park for private residences, should remove, and that the character of the entire neighborhood should change. But of this the plaintiff cannot complain. So, you have the panic of 1873, and the general depreciation of real estate throughout the city in consequence thereof. But of these matters the plaintiff cannot complain. There are many other circumstances which, upon this branch of the case, it will be your duty to look at, but you will, remember them, for yourselves. I can only repeat that any verdict for the plaintiff, must be based upon affirmative proof of special damage which directly and naturally resulted from some act of ‘the defendant that, within the rules laid down by me, is actionable.
If plaintiff’s proof does not come up to this requirement, it will be your duty to render a verdict for the defendant. So if you should find, that the actual rental of the premises from 1874 to 1880, amounted to what in *151 your judgment upon the evidence was, notwithstanding the matters complained of, a fair one during that period, the plaintiff cannot recover. In this connection I must make, because I have been especially requested so to do, a reference to the testimony of Mr. Castree, who was placed upon the stand as an expert by the plaintiff, and whose opinion was, that if no railroad had been there at all, $2000 would have been a fair rental per year during the period in question. If this were the only testimony available to the plaintiff upon this branch of the case, it would be fatal to plaintiff’s claim, for the evidence shows conclusively that in spite of all the matters complained of, the plaintiff actually collected a good deal more. But it is not. While therefore, the suggestion in the argument of plaintiff’s counsel, that Mr. Castree misunderstood the question propounded to him, is entitled to no weight, because the witness was not asked to explain his answer or recalled for that purpose, the plaintiff, on the óther hand, is not absolutely concluded by Mr. Castree’s statement. It is simply a circumstance in the case, to be weighed and considered with the circumstances covered by the testimony of the other experts called on both sides, and with the facts bearing upon the same point as disclosed by the whole case. In any event it is your duty to carefully sift, weigh and consider the whole of the evidence and all the bearings thereof, for the purpose of arriving at a result which will do-justice between the parties. The fact that the defendant is a rich and powerful corporation, must have no influence on your minds. You are to decide the issue submitted to you as you would if the defendant were a natural person, and to that end you must endeavor to divest yourselves of all prejudice, if any you should have. I have already instructed you that any verdict for the plaintiff must rest on affirmative proof of special damage directly caused by some act of the defendant, *152 which, within the rules laid down by me, is actionable, and that the burden of proof to make such a case is upon the plaintiff.
If his case does not come up to the requirements stated by me, yon will find for the defendant.
If his case does come up to the said requirements, except that the evidence is of such a character, that you cannot compute from it the damage sustained by the plaintiff, you will give to the plaintiff a verdict for six cents only.
If his case comes fudy up to said requirements, and you can compute the damage with certainty, you will give him a verdict which will fairly compensate him for the loss of rental ascertained by you, and state whether or not it is to carry interest. Beyond making compensation you cannot go. In no aspect of the case can you give vindictive or exemplary damages. Nor can you give, as I have already instructed you, mere speculative damages.
The jury found a verdict for plaintiff, and assessed the damages at six cents.
Note on Obstruction or Highways.
At about the same time the supreme court of the United States held, in the case of The Baltimore & Ohio R. R. Co. (plaintiff in error) v. The Fifth Baptist Church (15 Reporter, 673), that an action for damages lies by an owner and occupant of land,—in that case a religious corporation maintaining a church and Sunday-school,—against a railroad company who, subsequently to the commencement of such occupation, and under color of its statutory power to lay its track and construct other works necessary to the maintenance of its road, con-constructed on the lot adjoining the church an engine-house and repair-shop, the use of which, by noise, smoke, dust and cinders, was a nuisance, impairing the enjoyment of the church property.
In considering when an action will lie, for obstructing a highway, a park, or other public place, the practitioner will find it useful, in what will otherwise seem a mass of conflicting authorities, *153 to consider the cases in the following clauses. The references appended to each will give a convenient clue to the recent decisions most appropriate to actions of that class.
I. The member of a community who, in his actual use of a public highway, sustains an injury in person or property (including in the latter term, loss of time, expenses, &c.), by reason of an obstruction in the highway, through which he is passing, or endeavoring to pass, may maintain an action irrespective of his ownership of any real property, and recover the actual damage which he sustained, whether by falling into an excavation, or by being obliged to turn and lose time in pursuing a more circuitous route, or spending money in • transporting his load in a more difficult way.
See Pierce v. Dart, 7 Cow. 609, cited in Lansing v. Smith, 8 Id. 166; De Laney v. Blizzard, 7 Hun, 7; Brown v. Watson, 47 Me. 161; Powers v. Irish, 23 Mich. 429; Mayor, &c. of Baltimore v. Marriott, 9 Wend. 160; Gold v. Carter, 9 Humph. (Tenn.) 369.
For the meaning of damages peculiar to the plaintiff, see Francis v. Schoellkope, 53 N. Y. 152; Brown v. Watson, above, and Wood on Nuisances, 688.
n. The owner or lawful occupant of real property, who is in the same manner injured in his access thereto through the highway, may recover actual damages sustained by him in the same manner, including the loss of custom by the actual prevention of customers reaching his place, if the obstruction be on the same street; and in this case it is not essential that the obstruction be in front of his premises.
See Crooke v. Anderson, 23 Hun, 266; Van Brunt v. Ahearn, 13 Id, 388; Brakken v. Minneapolis & St. Louis R. R. Co., 2 Northw. Reporter, 124; Hood v. Smith, 5 Weekly Dig. 117; Stetson v. Faxson, 19 Pick. 147. To the contrary, see Houck v. Wachter, 34 Md. 265; Id. 6 Am. R. 332 (probably unsound, because plaintiff alleged loss of time peculiar to himself). Cook v. Corporation of Bath, L. R. 6 Eq. Cas. 177; Rose v. Grons, 5 M. & G. 613; Park v. C. & S. W. R. Co., 43 Iowa, 636.
But a tax-paying citizen, who owns property in the vicinity of a park, but not fronting thereon, has no standing, as such, in an equitable court, entitling him to maintain an action to enjoin the city authorities from selling the park. Teft ®. City of Buffalo, 65 Barb. 460.
An adjoining owner is not entitled to an injunction against the execution of a permit given by a municipal corporation, to another adjoining owner, to set shade-trees, and inclose an open space which had been dedicated to public use, and is not necessary as highway, unless it appear that defendant is inclosing it for some exclusive *154 use. In that case, it seems, he is entitled to an injunction. Burnet v. Bagg, 67 Barb. 154.
Also, Prosser v. City of Ottumwa, 42 Iowa, 509, holding that one who owns a ferry outside of a city, from which public travel is diverted by the failure of the city, to keep a certain street in repair, suffers no injury other than that shared by the general public, and is not entitled to damages therefor.
III. If, however, the obstructed highway or public place, be part of a tract, laid out in lots and highways, and sold with reference thereto, the purchaser and owner of such a lot, may have a right of action arising upon an obstruction in such a highway, irrespective of whether it prevents his access; because of its violating the express or implied covenant and impairing his easement.
See Taylor v. Hopper, 62 N. Y. 649; Clements v. Village of West Troy, 16 Barb. 251; Railroad Co. v. Schurmer, 7 Wall. 272; Bissell v. N. Y. Central R. R. Co., 23 N. Y. 61; Matter of Thirty-second Street, 19 Wend. 127; Matter of opening Lewis Street, 2 Id. 472; Livingston v. Mayor, &c. of N. Y., 8 Id. 85; Cox v. James, 45 N. Y. 557; Trustees of Watertown v. Cowen, 4 Paige, 510 [To the contrary, see Anderson v. Rochester, &c. R. R. Co., 9 How. Pr. 553]; Huttemeier v. Albro, 2 Bosw. 546; Matter of Opening Seventeenth Street, 1 Wend. 262; Pratt v. Buffalo City R. R. Co., 19 Hun, 30; Savannah R. R. Co. v. Shiels, 33 Geo. 601. Compare Kings County Fire Ins. Co. v. Stevens, 87 N. Y. 287,, where the description in the deed excluded the highway.
That the same rule applies to every purchaser, from the original proprietor, of lots in the same tract, see Wyman v. Mayor, &c. of N. Y., 11 Wend. 487.
Where, however, there is no laying out and sale, with reference to common use, but the owner of an estate has been in the habit of using, for the benefit of his estate, an easement first created by himself during the unity of the ownership, and he sells the servient part of the estate, there is no implied reservation to him of the easement over the part so sold, except in the case of strict and absolute necessity. See Shoemaker v. Shoemaker, 11 Abb. N. C. 80, and cases there cited.
See the following, where it was held that though one public way to property is closed, if there is another left, the property owner sustains no actionable damage. Fearing v. Irwin, 55 N. Y. 486; Coster v. Mayor of Albany, 43 Id. 399.
Also, see Hawley v. Mayor of Baltimore, 33 Md. 270, holding that the easement of right of way, attaching to the purchaser of a lot upon a plotted street, and the corresponding legal remedies, could only *155 be applied in respect to said street, up to the points of its intersection with other streets or public ways.
IV. In other cases than premises on such a tract, if the obstruction be opposite his own premises, on a highway, the fee of which belongs to him, subject to the public easement, he may have a right of action as owner of the fee, against the wrongdoer, as a trespasser upon his land, who is without justification, by virtue of the public easement, and also for the abatement of the nuisance, or for damages therefor. Story v. N. Y. Elevated R. R. Co., 11 Abb. N. C. 236.
See Adams v. Rivers, 11 Barb. 390; Mahon v. N. Y. Central R. R„ Co., 24 N. Y. 658; Craig v. Rochester, &c. R. R. Co., 39 Barb. 494; Wager v. Troy Union R. R. Co., 25 N. Y. 526; Milhan v. Sharp, 27 N. Y. 611; Knox v. Mayor, &c. of N. Y., 55 Barb. 404; Calkins v. Bloomfield and Rochester Natural Gas-Light Co., 1 Sup'm Ct. (T. & C.) 541; Washington Cemetery v. Prospect Park and Coney Island R. R. Co., Id. 655; Matter of N. Y. Central, &c. R. R. Co., 15 Hun, 63; People v. Law, 34 Barb. 494; Murdock, v. Prospect Park, and Coney Island R. R. Co., 73 N. Y. 579; Tompkins v. Hodgson, 4 Sup'm Ct. (T. & C.) 435; Dusenbury v. Mutal Telegraph Co., 3 Abb. N. C. 440; Mott v. Mayor, &c. of N. Y. 2 Hilt. 358; Hobart v. Milwaukee City R. R. Co., 9 Am. R. 461; Wilder v. De Cow, 26 Minn. 10.
V. If the fee is in the municipality in trust for public use as a highway, he has nevertheless a right of action under the doctrine of the Story case, where the obstructions transcend the limitations there defined.
In Peyser v. Metropolitan Elevated R. Co., N. Y. Com. Pl., General Term, March, 1883 (reported in this volume), the court held that the ** rule clearly established by the majority of the court in the Story case, 11 Abb. N. C. 236, was that where light, air and access, are interfered with, to which an abutting owner is entitled, damages for snch interference must be paid; and that the Story case was decisive of the Peyser case; and this notwithstanding that in the former, the fee of the street was in the abutting owner, while in the latter, the fee of the street in front of plaintiff’s lot was in the city, and the street opened under the act of 1813.
See Drake v. Hudson R, R. R. Co., 7 Barb. 508; Story v. N. Y. Elevated R. R. Co., 11 Abb. N. C. 236; Mason v. Brooklyn City, &c. R. R. Co., 35 Barb. 373; Milhan v. Sharp, 27 N. Y. 611; Patten v. N. Y. Elevated R. R. Co., 3 Abb. N. C. 306; Kellinger v. Forty-second St., &c. R. R. Co., 50 N. Y. 206; [To the contrary, see Sixth Ave., R. R. Co. v. Gilbert Elevated R. R. Co., 43 Super. Ct. (J. & S.) 393; and also Brooklyn Park Comm’rs. v. Armstrong, 45 N. Y. 234; but both *156 these cases are qualified by virtue of special legislative enactments there considered, as well as Spader v. N. Y. Elevated R. R. Co., 3 Abb. N. C. 467;] Ninth Ave. R. R. Co. v. N. Y. Elevated R. R. Co., 3 Abb. N. C. 347; Burrow v. Mayor, &c. of Baltimore, 2 Am. Jurist, 203; Lackland v. North Missouri R. Co., 31 Mo. 181, which holds that it is immaterial in such a case, whether the lot-owner owns to the middle of the street or not.
VI. That the public may have an action for the obstruction of a street dedicated to them, see The King v. Russell, 6 East, 427; Burrow v. Mayor, &c. of Baltimore, 2 Am. Jurist, 203; People v. Lambier, 5 Den. 9; Trustees of Watertown v. Cowen, 4 Paige, 510 [To the contrary, see People v. Kerr, 37 Barb. 357; Coykendall v. Durkee, 13 Hun, 260]; Matter of Boston & Albany R. R. Co., 53 N. Y. 574; People v. Metropolitan Telephone, &c. Co., 3 Abb. N. C. 304; Cook v. Corporation of Bath, L. R. 6 Eq. Cas. 177; Drake v. Hudson R. R. R. Co., 7 Barb. 508; Houck v. Wachter, 34 Md. 265; Mayor, c. of Baltimore v. Marriott, 9 Id. 160; Rex v. Jones, 3 Campbell, 229; Rex v. Cross, Id. 224; Moore v. Jackson, 2 Abb. N. C. 211; People v. Cunningham, 1 Den. 524; Commonwealth v. Passmore, 1 Serg. Rawle, 219; Hart v. Mayor, &c„ of Albany, 9 Wend. 571, with a query as to whether an individual, without being specially aggrieved, lias a right to abate or remove such a nuisance, citing cases.
VH. Where the owner dedicated a street, selling lots thereon, and ' reserving the fee of the street to himself, it was held that an action for ejectment, brought by him against a railroad, would not lie unless the occupation thereof by the defendant railroad was “ wholly inconsistent with the public easement ”—which was not held to be so in this case. Adams v. Saratoga, &c. R. R. Co., 11 Barb. 414.
VHI. Where the owner dedicates a street, selling lots thereon, and reserves his claims for damages for unlawful use of such street, he is entitled to an action therefor.
See Henderson v. N. Y. Central R. R. Co., 78 N. Y. 423.

 The map alluded to above is still in the possession of Trinity Church, and was in evidence in this action. It was made by Charles Loss, a city surveyor, is dated April, 1799, and delineates the so-called ‘‘Church Farm,” and adjacent lands. There is an earlier though smaller map, showing “ part of Hudson Square,” and adjacent streets, attached to an unrecorded, ancient and interesting deed (not in evidence in this case, although it was in Drake v. Hudson R. R. R. Co., 7 Barb. 508)., which can be seen, in a worn and dilapidated condition, at the comptroller’s office in this city. The following successive instruments indicate the course of events which gave rise to the various easements and interests involved in this case, and such of them as were not in evidence in this action are inserted to complete the reader’s view of this series of precedents, and the foundation and muniments of easements of this class.
The oldest deed of all (mentioned above) is dated June SO, 1797, and is a conveyance from. Trinity Church Corporation to New York city, of certain lands, laid out for streets “ in Trust that the same streets so granted be kept open for .the use of the citizens of the said city of New York forever.” It mentions the “ intended square.called Hudson Square, ” and is of sufficient interest here to warrant its insertion in full, as follows. Portions lost by the wear and tear of time are indicated 'by brackets.
*129 “ Tkis Indenture made the twentieth day of Jun<s in the year of our Lord One thousand seven hundred and ninety seven Between The Hector and Inhabitants^of the City of New York in Communion with the Protestant Episcopal Church in the State of New York of the first part and the Mayor Aldermen and Commonalty of the said City of New York of the second part witnesseth that the said parties of the first part for and in Consideration of the sum of Five Dollars of Lawful money of the United States -of Apnerica to them in hand well and truly paid by the said Parties of the second part at or before the Sealing and Delivery of these presents the receipt whereof is hereby acknowledged and thereof and therefrom and from every part and parcel thereof the said parties of the first part Do acquit Release Exonerate and for Ever Discharge the said Parties of the second part and their successors and every of them by these Presents Do Grant Bargain sell Alien Release Convey and Confirm unto the said Parties of the second part and to their successors and assigns for Ever All those Certain Pieces or parcels of Land in the sixth Ward in said City belo [ ] of the first part and laid [ ] for Streets, to wit, the Land of the said Parties of the first part laid out for Greenwich Street as now opened [ ] six feet in Width, their Land laid out for Washington Street from Reade Street as far as the Southern side of the Land of Frederick Rhinelander, being [ ]-y feet in Width, their Land laid out for Hudson Street from Barley Street to the Pasture Fence at Moore Street on the South side of the intended Square • Called Hudson Square the same Hudson Street being in Width Ninety feet, and their Land laid out for Duane Street and Jay Street all which Streets are Designated upon the Map or Chart to these presents annexed together with all and singular the [ ]-its Privileges advantages Emoluments Hereditaments and Appurtenances whatsoever to the said hereby Granted Premises belonging or in any-[ ]-e appertaining and the Reversion- <fc Reversions Remainder and Remainders Heñís Issues and Profits of all and Singular the said Premises [ ] every part and parcel thereof with the appurtenances To Have And To Hold all and singular the said Pieces or parcels of Land Hereditaments and Premises above in and by these presents Released and Conveyed and every part and parcel thereof with the appurtenances unto the said parties of the second part their successors and Assigns to the only proper use and behoof of the said parties of the second part their Successors- and Assigns for Ever To [ ? ] Intuí *130 (Intent) Nevertheless and in Trust that the same Streets so granted be kept open for the use of the Citizens of the said City of New York for Ever. In Witness whereof the said Rector and Inhabitants of the City of New York in Communion of the Protestant Episcopal Church in the State of New York have caused their Seal to be affixed hereunto the day and year first above Written—Witness John Charlton Church Warden the same Day and Year.
“John Charlton.”
[Attest to interlineation]
“Rich : H Arison”
“Clerk—”
.A quaint oval stamped paper seal is attached to the instrument by' ribbons. The accompanying map shows a part of Hudson Square, Hudson Street, Greenwich, Moore, Washington, Duane, Jay, etc.
Next in order is a deed dated August 23, 1802. This was not in evidence, and is apparently unrecorded, but it can be seen in the comptroller’s office. The conveyance is from Trinity Church to New York city of certain lands for certain streets, “in trust that the same be left open as public streets for the use and benefit of the inhabitants of the said city forever.” On the accompanying map is the following memorandum. “ Hudson Street to Moore Street and Greenwich Street to Watts Street were surrendered to the corporation in 1779— N. B. The streets stained with red are now given up to the city corporation.”
This deed, and the privileges arising thereunder, was the subject of consideration and action by the common council of the city of New York, as will be seen by reference to their “ minutes,” as follows, wherein they mention the receipt thereof and refer it to the examination of the recorder and street commissioners, [Minutes of Common Council, vol. 14, p. 407, Aug. 23, 1802,] who report “that they find the said conveyance to be accurate and sufficient whereupon it is ordered, that it be “preserved among the conveyances of this board and recorded in the clerk’s office.” M. C. C. vol. 14, p. 413, Aug. 30, 1802. Later on it is “ ordered that the street commissioners be directed to examine and report the situation of the streets lately ceded to this board by the corporation of Trinity Church and report what is proper to be done. See same volume, p. 439, Oct. 4, 1802. In due time they report the existence of certain Incumbrances upon the said streets, finding therein several occupied houses, and *131 gravely mention what is now a bit of local history, which would have been within the memory of worthy Peter Cooper, that “ almost all that part of the streets ceded as aforesaid and lying between Greenwich street and the river is occupied by sawyers either by their pits or logs.” They then recommend “that notice should be given to all those who are in possession of any part of the said streets either by houses or otherwise that all such incumbrances be removed on or before the first day of May next. It was thereupon order-[es!] that the said report be confirmed and that the clerk of this board give such notices accordingly.” See same vol. p. 451, Oct. 18, 1802.
By consulting the volume of indexes, references to other and similar proceedings can be found. Volume 15 of the minutes, we are informed, has been missing for thirty years, and a gap is thereby made in these records from May, 1803, to December, 3, 1804.
We are informed that none of these' minutes were in evidence in the present case. Extracts from the minutes of the vestry of Trinity Church, however, were, though plaintiff objected to their admission “ on the ground that the evidence offered appears to relate to transactions that occurred after the conveyance to the plaintiff’s original grantee. Objection overruled. Plaintiff excepts.” It is understood that upon them and upon the recital in the trust deed of 1827, that “ whereas the said parties of the first part [Trinity Church] did on or about the year of our Lord One thousand eight hundred and three, appropriate and lay out a certain piece or parcel of land situate in the fifth ward of the city of New York, called Hudson Square, bounded [etc.] to the end and intent that the same should be and remain an ornamental square or park,” rested the judicial inference that “ in 1803 the said square seems to have been set apart by the corporation [of Trinity Church] as a private ornamental park or square,” etc., for which see opinion.
Some extracts of the aforesaid Trinity Church minutes maybe pertinent in this connection. They begin with the resolution of November 13, 1797, “that the committee of leases cause a correct map to be made of the whole estate of this corporation and this we understand was the origin of the “Church Farm ” or so-called “Loss Map.”
On April 14, 1803, it was “resolved that the committee of leases be vested with power to make such arrangements with the purchasers of the lots on the square as they may think proper.”
*132 On May 12, 1803, were various “ resolutions restricting the buildings to be erected on Hudson Square.”
On June 12, 1806, it was “resolved that Hudson Square be granted to the lessees' of the adjoining lots, during their leases, in such manner as may best conduce to its improvement.”
The various considerations, resolutions, reports of committees, and observations upon the original drafts of what gradually developed the action of Trinity Church in respect to Hudson square and the surrounding property, and finally matured into the important trust deed of 1827, is exposed and may be traced at length in these minutes. See additional entries under the dates of Dec. 8, 1803 ; May 12, ¿1823; Juno 9, 1823; March 13, 1826, and May 23, 1826.
It would almost seem that -the missing volume of the common council minutes, for 1803 and 1804 (although the corresponding index does not reveal it) or some other records would throw additional light upon the precise time when Hudson square was first set apart for “ a private ornamental park. or square,” which the judicial inference places in the year 1803. Possibly it was earlier.
Then follows a conveyance, dated December 1, 1813, and recorded March 18, 1814, at Lib. 105, p. 159. This is from Trinity Church to Hew York city. In consideration of a release by the city to the church of a certain piece of land no longer intended to be occupied as a street, the-corporation “do give, grant, bargain, sell, release and confirm unto the said parties of the second part, their successors and assigns, all those certain pieces and parcels of land, situate in the said city laid out and opened, or intended to be laid out and opened, as, and for public streets, and delineated upon the map or chart thereto annexed .... subject only to such leases and terms of years as may exist or have been granted of any parts and parcels thereof, the rents whereof are hereby reserved .... to the said parties of the second part, and their successors forever, for -public uses in like manner as the other streets of and in the said city, are used and employed.”
The above cedes to the city, among others, Hudson street; and plaintiff’s premises being situated at the northwest corner of Hudson and Laight streets, are affected thereby, and this becomes of importance, and was in evidence.
Another and similar instrument, dated July 10, 1815, and recorded *133 February 17, 1831, at Lib. 269, p. 316, between the same corporations recites that:—“Whereas divers pieces or parcels of land within the said city of New York, and lying within the boundary lines of the lands belonging to the said parties of the first part, situate between Harrison and Watts streets, are used and occupied as public streets, and the said parties of the first part heretofore agreed to grant and cede.the same for that purpose to the said parties of the second part but no grant or cession for the same appears to have been executed and the said parties of the second part are now desirous to receive the same. Now therefore” .... etc., the lands so ceded “to be laid out and opened as and for public streets,” .... and are “ delineated upon the map or chart hereto annexed.” .... being granted “to the said parties of the second part and their successors forever, for public uses, in the like manner as the other streets of and in the said city are used and employed.”
We now come to the Declaration of Trust between Trinity Church and certain adjoining property owners whose lots fronted on Hudson square. This is dated May 22, 1827, and recorded May 12, 1830, at Lib. 262, p. 184. As before remarked, it recites the laying out of the square for ornamental purposes in 1803. Also, the designation and. numbering, from one to fifty-eight, on a map [see the Loss map] of the lots fronting on said square, and that they have been sold. That “ Hudson square has been since enclosed and improved, but no satisfactory provision having been made for maintaining and supporting the said square, the said parties of the first part have not yet executed any conveyance or assurance of or concerning the use and enjoyment of the same.” As to the enjoyment of the park: “It being expressly understood that such right, privilege and benefit is to attach exclusively to such of the said lots, parts or parcels of lots as are situate and fronting ” on said square. That “it has been mutually agreed by and between the parties to these presents that the legal title and estate of and in the same piece or parcel of land called Hudson square shall remain vested in the said parties of the first part and their successors upon trust to preserve and continue the same as a private ornamental park or square for the common resort and recreation of all the parties to these presents of the second part and of their respective heirs and assigns being owner or owners of any or either of the said adjacent lots or of any or either of the said parts or parcels *134 thereof situate and fronting as aforesaid.” That the fronting lot owner’s tenants have similar privileges.
Row, therefore, etc., they covenant, etc., “ upon trust to preserve and continue the same forever hereafter as a private or ornamental park or square for the uses and purposes hereinbefore expressed and declared, and subject to the conditions, provisions, regulations and agreements hereinafter contained.”
Various provisions for the maintenance and use of the square follow: “ And provided further that no building or structure whatever shall on any pretense be erected or put on the said park or square •without the consent or concurrence of the said parties of the first, part and of at least so many of the said other owners as shall together hold and possess two-thirds in number of the lots or parts or parcels of lots situate and fronting as aforesaid which are now held and possessed by the said parties hereto of the second part.”
It also provides that if there is any default or failure by the said owners in the proper payment of the costs, fees, charges and expenses, then that the said parties of the first part, and their successors may ‘1 grant and convey the said park or square to the mayor, aldermen and commonalty of the city of Rew York, their successors and assigns forever as a public place or park for the use and resort of all the inhabitants of the said city on such conditions and under such restrictions and regulations as to them, the said parties of the first part or their successors, shall seem meet and expedient.”
The following clause paves the ways for their later conveyance to the railroad: “ Provided further that if at any time hereafter the said parties of the first part or their successors and so many of the said other owners of the said lots and parcels of lots situate and fronting as aforesaid as shall together hold and possess two-thirds in number of all the lots now held and possessed by the said parties of the second part shall, by writing under their respective seals, mutually agree upon any other disposition to be made of the said park or square, then and in such case it shall be lawful for the said parties of the first part in their discretion to dispose of, sell and convey the said park or square in such manner and for such purposes as shall or may be expressed in such writing, it being understood and hereby expressly agreed that in case of any such disposition, sale and conveyance' as is last above mentioned, the said parties of the first part and the others of the said *135 owners shall severally participate in and have and enjoy the benefit and advantages thence resulting according to the actual extent in front of the land which they may severally hold and possess, fronting on either of the said streets called Varick, Laight, Hudson and Beach streets, opposite to the said park or square.”
Along in 1866, we find recorded a series of agreements by owners and mortgagees of lots fronting on St. John’s park [formerly called Hudson square] to the effect that Trinity church shall and may “sell and convey in fee simple the said square .... to such person or persons, and for such purpose or purposes as to them [it] shall seem expedient, provided the price or sum for which the same shall be sold, shall not be less than one million of dollars.” One of these was sent abroad, where it was executed at the “City of Paris and Empire of France.”
It is said that the expense of obtaining them amounted to a large sum. For an example of one of these, see Lib. of Conv. 1003, p. 348, bearing date October 9, 1866, and recorded March 9, 1867.
Having obtained the consent of the said property owners etc., to convey, as was contemplated in the deed of trust in 1827, Trinity Church now covenants and agrees “to and with such owners that we will sell and convey in fee simple the said square to such person or persons, and for such purpose or purposes as to us shall seem expedient, for a price or sum not less than one million of dollars.” This instrument is dated October 9, 1866, and recorded Lib. 1003, p. 348, on March 9, 1867.
Finally, by an indenture dated March 2, 1867,—upon which, by the way, there is one thousand dollars in revenue stamps,—Trinity Church conveys in pursuance of certain previous indentures and agreements, to the Hudson River Railroad Company in fee, “All that certain piece or parcel of land situate, lying and being in the fifth ward of the city of New York, being part of the lands of the said parties of the first part called Hudson square.”
Plaintiff’s chain of title to the premises in question, in this action, situated at the northwest corner of Laight and Hudson streets, is as follows: Deed from Trinity Church Corporation to Daniel- Paris, dated May 9, 1805, recorded August 10, 1822, Lib. 161, p. 268, executed and acknowledged in 1822. As under this, plaintiff claimed to own in fee to the middle of the streets bounding his premises, it *136 may be well to extract therefrom, for the reader’s convenience, as follows:—
“ All that certain lot, piece or parcel of land situate, lying and being in the fifth, ward of the city of New York and distinguished on a certain map or chart made of such part of the lands of the said vector and inhabitants as is commonly called the church farm by the number one thousand one hundred and -'fifty-eight, and bounded easterly in front, by Hudson street, on the northerly side by a lot of land distinguished in the said map of chart by the number one thousand one hundred and fifty-seven, westerly in the rear, by a lot ot land distinguished in the said map or chart by'the number one thousand one hundred and fifty-nine, and on the southerly side by Laight street, containing in breadth in front and rear twenty-five feet, and in length on each side one hundred feet, together with all and singular, the profits, privileges and emoluments, hereditaments and appurtenances whatsoever, to ,the said hereby granted premises belonging or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits of all and singular the said premises, and of every part and parcel thereof, with the appurtenances, and also all the estate, right, title, interest, property claim and demand whatsoever in law and equity of them, the said party of the first part, of, in and to all and singular the said premises above mentioned, and of, in and to every part and parcel thereof with the appurtenances to have and to hold all and singular, the said lot, piece or parcel of land, hereditaments and premises, above, in and by these presents released and confirmed, and every part and parcel thereof with the appurtenances unto the said party of the second part, his heirs and assigns, to the only proper use and behoof of the said party of the second part, his heirs and assigns forever.”
The next instrument in plaintiff’s chain, is a deed from Daniel Paris to Nehemiah Brush, dated June 36f 1833, recorded August 10, 1833, Lib. 163, p. 307.
Following this, we come to a deed from Nehemiah Brush to David Greene, dated October 15, 1833, recorded April 17, 1834, Lib. 309, p. 557.
About this time, there was a deed of the rear part or “L,” on Laight street, of the premises in question from George Prescott to *137 Margaret Greene, dated 1853, acknowledged January 27, 1853, recorded Lib. 633, p. 361.
We now come to the will of David Greene, plaintiff’s father, dated June 2, 1855, proved December 2, 1856, devising to his wife, Margaret Greene, his real estate.
And then we have the will of Margaret Greene, mother of Dr. Greene, the plaintiff, giving and bequeathing to Caroline Greene her real estate, dated November 3, 1862, proved January 13, 1864.
And following this, finally, the will of Caroline E. Greene, dated October 24, 1873, admitted to probate August 12, 1874, which devises and bequeaths all her real estate to the plaintiff, John W. Greene.

 See The King v. Russell 6 East, 426, 429; where the language of the court is: “ That the primary object of the street, was for the free passage of the public, and anything which impeded that free passage, without necessity, was a nuisance.”