MILHAU *et al. v.* SHARP *et al.*

The corporate authorities of the city of New York have no power to confer upon individuals, by contract for an indefinite period, the franchise of constructing and operating a railroad in the public streets, for their private advantage.

The powers of the corporation, in respect to the control and regulation of the streets, are held in trust for the public benefit, and cannot be abrogated nor delegated to private parties.

A resolution of the common council, authorizing private persons to construct and operate a railroad upon certain conditions, without limitation as to time, or reserving a power of revocation, is not a license nor an act of municipal legislation merely, but a contract, which, if valid, it could not abrogate.

Such a contract, if valid, conveyed, it seems, an immediate freehold interest in the streets, and a right to the exclusive use of the rails to be laid upon them, in perpetuity; and is void because it would deprive the corporation of its power to control and regulate such use.

It is no answer to the application for an injunction, that the wrong complained of is a public nuisance, if it subjects the plaintiff to a special injury, not common to the public.

The finding of fact, that a proposed railroad "will be specially injurious to the property of the plaintiffs, and other property similarly situated," construed as showing a special and direct injury to each of the plaintiffs in severalty, not a remote one, and not merely a common or public nuisance.

THIS action was brought by four persons, inhabitants of the city of New York, severally owning lots with valuable buildings thereon, situated upon Broadway in that city, and claiming to own the fee of the land in front of their several buildings to the centre of the street, subject only to the public easement, or right of way over it; the object of the action being to prevent by perpetual injunction, the defendants from laying a railway track in Broadway and running cars thereon for the carrying of passengers in pursuance of a resolution of the common council of that city.

The plaintiffs stated that their lots and buildings were very valuable, and that they had been accustomed to pay large taxes thereon; that Broadway is an ancient street, opened about 150 years ago by the then owners of the lands over and through which it passes, for their own convenience, and was by them allowed to be used by other citizens and travelers as a common public street or thoroughfare, and has ever since continued and still is, such public street or thoroughfare; that a large portion of the trading and commercial business of said city (greater than that of any other street) is transacted in said street; and that the street is constantly thronged with all kinds and descriptions of vehicles and passengers.

The resolution of the common council, passed on the 29th of December, 1852, declared that the defendants and those who might from time to time be associated with them, all of whom were therein designated as associates of the Broadway

railway, had the authority and consent of the common council to lay a double track of railway in Broadway and Whitehall or State street, from the South Ferry to Fifty-ninth street, and to continue the same from time to time along the Bloomingdale road to Manhattanville, which continuation they were required to make as directed by the common council. Such tracks were required to be laid under the direction of the street commissioner, in or near the middle of the street, the outer rails not exceeding twelve feet six inches apart, and the rails laid even with the pavement, the inner portion of the rail being of equal height with the outer, with grooves not exceeding one inch in width, or such other rails as should be approved by the street commissioner or common council, on such grades as then were or might thereafter be established by the common council; and the said associates were required to keep in good repair the space between the rails and one foot on each side; and to use no motive power except horses below Fifty-ninth street.

The associates were required to place new cars on the road with all the modern improvements for the convenience and comfort of passengers; and to run cars thereon every day, both ways, as often as the public convenience might require, under such direction as the common council might from time to time prescribe. They were also required, in all respects, to comply with the directions of the common council, in the building of such railway, and in the running of the cars thereon.

It was provided that no higher rate of fare should be charged for the conveyance of passengers from any one point to any other point along said route, and such combined system of routes as might thereafter be adopted, by means of cars and transverse omnibusses, than five cents for each passenger.

The twelfth and thirteenth articles of the resolution were as follows:

" *Twelfth.* In consideration of the good and faithful performance of all these conditions, stipulations and requirements,

and of such other requirements as may hereafter be made by the common council for the regulation of the said railway, as aforesaid, the said associates shall pay, for ten years from the date of opening the said railway, the annual license fee for each car, now allowed by law, and shall have a license accordingly; and after that period shall pay such amount of license fee, for further licenses, as the corporation, with permission of the legislature, shall then prescribe; or, in default of consenting thereto, shall surrender the road, with all the equipments and appurtenances thereto belonging, to the said corporation, at a just and fair valuation of the same.

" *Thirteenth.* Within a reasonable time after the passing of this resolution, the said associates, or a majority in interest thereof, shall form themselves into a joint stock association, which association shall be vested with all the rights and privileges hereby granted, and shall have power, by the votes of at least a majority in interest of the associates, to frame and establish articles of association and by-laws, providing for the construction, operation and management of the said railway, the mode of admitting new associates, and of transferring the shares or interests of any of the associates to new associates or assigns, the number, duties, mode of appointment, tenure and compensation of officers, the manner of making contracts, amending the by-laws, and calling in assessments from the associates, and generally the means and mode of establishing the railway and carrying it on, and of controlling and managing the property and affairs of the said association."

By the fourteenth article it was provided, that the association should not be deemed dissolved by the death or act of any associate, but his successor in interest should stand in his place; and the rights of each associate should depend on his own fulfillment of the conditions imposed on him, by the restrictions of the resolution, of the articles of association and by-laws of the association; and in case of his failure to fulfill the same, after twenty days' notice in writing to him to do so, his rights should be forfeited to, and devolve upon the remaining associates. Also, that said associates should incorporate

themselves under the general rail road act whenever two-thirds in interest of the associates should require it.

By the fifteenth article, the associates whose names were set forth in the resolution, were required, by writing, to be filed with the clerk of the common council, to signify their accept ance thereof, and agree to conform thereto ; and all new asso- ciates or assigns, duly admitted according to the provisions of the articles of association and by-laws, should be deemed par- ties to such agreement.

The foregoing are the leading features of the resolution ; but there were other provisions containing more minute direc- tions in regard to the laying of the track, and the structure and management of the cars.

The plaintiffs alleged that the defendants, immediately after the passing of the resolution by the common council, signified their acceptance thereof, and agreed to conform thereto, by writing, filed in accordance with the resolution. That the defendants, under color of the authority contained in said resolution, threatened to enter upon Broadway, and take up the Russ and other pavements, and dig up and subvert the soil in that part of Broadway between Whitehall and Fifty- ninth streets (including the portion, thereof belonging to the plaintiffs), to take possession of said street, and lay down and establish a railroad therein, and run cars thereon, for their own private interest and emolument, to the great injury and damage of the plaintiffs and other property owners on and in said street, and to their and each of their property ; and without making to them or either of them any compensation therefor ; and without paying or providing for the payment to them or either of them, of the damages resulting to them and their pro- perty, arising from the taking of their land lying in the street, and from laying said railway thereon.

That the laying of the railway would require at least four months, during all which time the street would be rendered almost wholly impassable, to the great injury of the plaintiffs and others having occasion to travel in said street. That the street was too narrow (its average width not exceeding forty

feet) to admit the establishing of such railway, consistently with the rights and interests of citizens, and if established, it would be a public nuisance.

That if the defendants were allowed to take up the pavement, and establish such railway, not only would the Russ pavement, lately laid in the street at great expense to the plaintiffs, be destroyed, but the lots owned by the plaintiffs would be seriously and irreparably injured and damaged, by means of the obstruction caused by the cars to the passage of vehicles, &c., in the street, and the consequent diversion of travel and business to other streets. That the effect would be to take from Broadway the large commercial trade carried on therein, thereby causing a depreciation of the value of all the lands and buildings located on said street, and the rents and income thereof. The title of the corporation of the city to the fee simple of the streets, and the power of the common council to pass the resolution, were denied, and it was insisted that the resolution and the acceptance of it were of no binding force, and conferred no power on the defendants to construct or establish the contemplated railway.

It was also charged that the common council acted corruptly in passing the resolution; that they rejected propositions from responsible persons, to pay to the corporation from $100,000 to $250,000 per annum for the privilege of building the railway, and of conveying passengers on the same or more favorable terms; and that the resolution was passed in violation of an injunction previously issued by the Supreme Court, and served upon many of the members of the common council by whose votes it was passed, forbidding its passage.

The defendants, in their answer, insisted that the street belonged to the corporation in fee simple absolute; and alleged that the common council had power to regulate the streets, to lay down rails, and to pass the resolution in question. They denied any knowledge of the plaintiffs' title to the street or to lots situated upon it. They denied the fraud alleged in the passing of the resolution; stated that the propositions mentioned by the plaintiffs were made in bad faith, and intended

to stop the building of the road; that such propositions would not have produced the amount stated; and that the defendants' proposition was the most advantageous to the city. They also stated that it was their design to make their railway a trunk line, and to establish lines of omnibuses on the cross streets, at convenient distances; and they had been required, by a committee of the common council, before the passage of the resolution, to make an agreement to purchase six of the principal lines of omnibuses running upon Broadway, at an expense of $450,000. That the railway would not occupy exclusively the street; that the street was not too narrow to admit the railroad without impediment to travel; that it would not be a nuisance, or injurious to the plaintiffs or the public; that it would take but two months to build it; that only fifteen feet of the pavement need be taken up; that there would be abundant space each side of the pavement taken up, for vehicles to pass; that the road would relieve Broadway, and would not injuriously affect the value of street property; that the defendants had no notice of the suit in which the injunction was obtained, or of the proceedings in it.

The trial was had at the October special term in New York, in 1853, before Mr. Justice HARRIS, without a jury, who found that Broadway was opened as a street at different periods, commencing prior to 1695, all below Union place having been opened before 1813. That the plaintiffs were severally owners and occupants of buildings fronting upon said street, and of the lots upon which the buildings were erected, as particularly set forth in the complaint, and had been such owners for several years; and had, during such time, severally paid taxes upon such property to an amount exceeding $250 per annum, as stated in their complaint. That the establishment of a railroad in Broadway would be specially injurious to the said property of the plaintiffs, and other property similarly situated on the same part of Broadway.

There were other findings of fact, but they are not essential to the determination of the questions presented on this appeal.

It was also decided, as a matter of law, that the resolution

in question was not a legislative act, but a contract, and was not within the powers conferred upon the common council, and was, therefore, absolutely void; and conferred no authority whatever upon the defendants to enter upon Broadway and establish a railroad therein. The perpetual injunction prayed for was accordingly granted.

Exceptions were taken to the several findings, and, on appeal to the court at general term, the judgment of the special term was affirmed, and the defendants brought the present appeal.

*David Dudley Field,* for the appellants.

*William Allen Butler,* for the respondents.

SELDEN, J. In the present aspect of this case, there are but two material questions presented for consideration:

1st. Had the common council authority to grant to the defendants the right to construct and maintain a railway through Broadway, upon the terms specified in their resolution of December, 30th, 1853?

2d. If that grant was not valid, have the plaintiffs shown such prospective special injury to their rights as entitles them to the relief granted by the Supreme Court?

The first question was distinctly presented to this court and decided adversely to the validity of the grant, in the case of *Davis* v. *The Mayor, &c., of New York* (14 N. Y., 506). The position of the defendants' counsel, that the decision in that case is not to be regarded as an adjudication upon this point, may be correct, as the judgment of the court, as finally pronounced, did not necessarily involve that question. Five of the judges, however, declared the resolution void, and I entertain no doubt of the correctness of that opinion. It is not necessary now to decide the question, about which two of the judges in that case differed in opinion, involving the power of the common council, or of the corporation of New York, in any manner, or under any circumstances, to authorize the construction and use of railways in the streets of that city. This case involves, not the general power of the corporation

over the streets, but only the question whether the common council had authority to grant the particular privilege which the defendants claim. In determining that question, the provisions of the resolution granting those privileges must be regarded as indivisible. I allude only to the essential features of the plan. The thirteenth and fourteenth articles, which assume to authorize the creation of a joint stock association, and to provide for the transfer and forfeiture of shares, and the general management of the affairs of such association, may be disregarded without touching upon the main objects of the resolution. I therefore lay out of view those articles, as having no bearing upon the question as to the validity of those parts of the resolutions upon which the defendants rely. The provisions giving the right to lay the track of the railway, determining its location, width and manner of construction, the quality of the cars, the times of their running, the motive power to be used, the maximum rates of toll to be charged, the amount of license fees to be paid, and the duration of the privileges granted, are all parts of a single scheme, which are incapable of separation. The whole scheme is valid, or no part of it. These privileges, whether they create a monopoly or not, constitute a franchise. The definition of franchise, by Bouvier, is a "privilege conferred by grant from the government, and vested in individuals." Kent says (3 Com., 458), "The privilege of making a road, or establishing a ferry, and taking tolls for the use of the same, is a franchise." Railroads certainly do not form an exception. (3 Paige, 45; 14 N. Y.) Monopoly is not an essential feature of a franchise. A corporation with banking powers would be no less a franchise, if there were no law restraining private banking, which alone gives to banking corporations the character of monopolies. The granting of franchises was a part of the prerogatives of the British Crown (Finch's Law, 164), which, on the severance of the colonies from Great Britain, became vested in the people, and no franchise can be created in this State, without authority to create it derived from the people through the legislature. The corporation of New York can grant ferries

(or at least could do so, prior to the act of May 14, 1845, on the subject), because that power has been expressly granted to it (1 Hoff. Est., and Rights of the Corporation of New York, 285, 281, 286; *Benson* v. *The Mayor, &c.,* 10 Barb., 223), but neither the corporation nor the common council has been authorized to create a franchise of the character of that described in the resolution under consideration. It follows that the resolution, relating to a subject not within the powers of the body passing it, is merely void.

On other grounds, without reference to its character as creating a franchise, the resolution is equally objectionable. It was not, as has been insisted, an act of legislation, but on the contrary, it possesses all the characteristics of, and was in fact, a contract. It was held to be a contract in the case of *The People* v. *Sturtevant* (9 N. Y., 273), and but a slight examination of its provisions is requisite to show the correctness of that decision. Prior to its acceptance by the defendants, the resolution was only a proposition, having no binding force whatever. It was certainly not then a law, and since that time the common council have taken no action upon it. Upon its acceptance (if valid), it became a contract between two parties, binding each to the observance of all its provisions. It was something more than a mere executory contract between the parties. It amounted also to an immediate grant of an interest, and, it would seem, of a freehold interest in the soil of the streets to the defendants. The rails, when laid, would become a part of real estate, and the exclusive right to maintain them perpetually is vested in the defendants, their successors and assigns. I say perpetually, because there is no limitation in point of time to the continuance of the franchise, and no direct power is reserved to the corporation to terminate it. Indirectly such termination might, perhaps, be effected, after the expiration of ten years, by making the exercise of the privileges so burdensome through the increase of license fees as to compel their abandonment. This, however, could only be accomplished through the aid of State legislation; and if we assume that the laws of the State in that respect are to

remain unchanged, the privileges granted are perpetual. The title to the rails when permanently attached to the land, and such right in the land as may be requisite for their perpetual maintenance, are therefore granted to the defendants by the resolution. The exclusive use of the rails when laid for the purpose for which they were designed, would also, as I think, belong to the defendants. Other people might drive across them, and to some extent along them, with ordinary carriages, but they would have no right to run cars upon them for their own convenience or profit. Any use which the public could have of them, not exercised through the defendants' franchise, would depend upon the fact that the rails would not entirely exclude from the ground they might occupy, the character of a public street. The public might continue to pass over the track (when not in use by the defendants), but that must be done with such inconvenience, more or less, as the rails might occasion. No direct benefit could be derived by the public, or by individuals not interested in the road, from its construction, otherwise than through the use of the cars to be run upon it. Indirectly, other benefits might arise, and possibly of sufficient magnitude to overbalance the inconvenience arising from its construction and use. Whether this would be so or not, is a question the solution of which does not belong to this tribunal, and I should express no opinion in regard to it if I had formed any. So far as that question is involved in the present case, it is already conclusively determined against the defendants, and my present purpose is only to show the importance, the exclusive character, and the permanency of the powers conferred, or attempted to be conferred, upon the defendants by the resolution. If that resolution should be sustained, no power would remain in the corporation to remove the railway after its construction, if it should prove to be a nuisance, or to reduce the rate of fare, if it should be found unreasonably high, or to compel the introduction of any improved method of conveyance, if at any future time such method should be invented, without the consent of the defendants or their successors; and the powers

of the corporation over the street in many other respects would be abridged. Those powers were given to the corporation as a trust, to be held and exercised for the benefit of the public, from time to time, as occasion might require, and they could neither be delegated to others, nor effectually abridged by any act of the corporate authorities. (*The People v. Kerr*, 27 N. Y., 188; *Presbyterian Church* v. *Mayor, &c.*, 5 Cowen, 538; *Coates* v. *Mayor, &c.*, 7 id., 585; *Goszier* v. *Corporation of Georgetown*, 6 Wheat., 593.) Such trust is, in this respect, governed by the general principle, that the duties of a trustee cannot be delegated without express power for that purpose conferred by the author of the trust. (Hill on Trustees, 175, 540, Phil. ed., 1846.)

The defendants' counsel insists that the resolution is not a contract, but a license, revocable at the pleasure of the common council. This position cannot be reconciled with the decision in *The People* v. *Sturtevant, supra*, nor with the principle declared by the Supreme Court of the United States, in the Dartmouth College case (4 Wheat., 519), and other kindred cases, in substance, that grants of such franchises, though made by acts in form legislative, become, when accepted and acted upon, contracts, not subject to be recalled or modified, except in accordance with express reservations contained in the grants. No such reservation is made by the resolution in question, and the privileges which it grants, if within the power of the common council, are already beyond the control of any future act of that body. (Smith's Com., §§ 252, 253.) No reservation of that kind, however, would have been of any service, as it could not supply the defect of power. The resolution is, therefore, void, for the reasons that it purports to create a franchise which the common council had no power to create; to vest in the defendants an exclusive interest in the street, which the common council had no power to convey; and to divest the corporation of the exclusive control over the street, which has been given to it as a trust for the use of the public, and which it is not authorized to relinquish.

The remaining question is, whether the plaintiffs have shown

such prospective and special injury to their rights, as likely to result from the construction of the railway, if such construction should be allowed, as to entitle them to the perpetual injunction granted by the judgment appealed from. The material facts found by the judge at the trial, bearing upon this question, are as follows: That the plaintiffs were severally owners and occupants of buildings fronting on Broadway, and of the lots of land upon which said buildings were erected, as particularly set forth in the complaint, and that the establishment of a railroad in Broadway would be specially injurious to said property of the plaintiffs, and other property similarly situated in the same part of Broadway. The defendants do not deny that they design to construct the railway, and threaten to enter upon Broadway and take up the pavement for that purpose, as alleged in the complaint, and they claim to justify their action, in this respect, under the resolution of the common council. There is no express finding either way upon the question (upon which the parties in their pleadings are at issue) whether the plaintiffs own the fee simple of the lands in front of their respective buildings, to the centre of the street, or not. If it should be considered that such title in the plaintiffs was necessary to justify the finding, that the railroad would be specially injurious to their property, this court would be bound to infer, in support of the finding, that that fact was established. *Carman* v. *Pultz*, 21 N. Y., 537; *Grant* v. *Morse*, 22 id., 323.) It was held in this court, in the case of *The People* v. *Kerr*, *supra*, that the plaintiffs had no title to the lands over which the streets passed, in front of their lots, and therefore could not maintain an action to prevent the construction of a railroad in such streets. It appeared, however, in that case, that the lands in front of the plaintiffs' lots, were taken for the street, under the act of 1813, and it was held that where streets were opened under the act, the fee of the lands was vested in the corporation. In the present case, it appears that all that part of Broadway which is below Union place, was opened as a street prior to 1813, and no evidence is furnished to us of the extent of the interest taken by the corporation in streets so

opened. We must, therefore, hold in accordance with the general rule, that the proprietors of adjoining lands own to the centre of the street. It is not found that the plaintiffs' lots were situated below Union Place, but that fact was not questioned by the defendants' counsel, except as to one lot, and if his statements as to that were correct, it would not impair the rights of the parties arising from their ownership of the other lots. Even if it should be held that there is no distinction in respect to the title of the corporation, between streets opened prior to 1813 and those opened since that date, the general rule that the fee is vested in the corporation would not be absolutely incompatible with a remaining fee in adjoining proprietors, under special circumstances, and it must be inferred, in support of the finding, if it could not otherwise be justified, that such special circumstances had been shown. "Judgments are not reversed in this court, because the facts found by a referee, or judge, do not affirmatively sustain them. On the contrary, the judgments of subordinate courts are presumed to be right, unless it appear that a rule of law has been violated, after assuming that the facts have been viewed in the most favorable light which the case will admit of." (22 N. Y., 324, 325.) This rule also forbids an adoption of the inference suggested by the defendants' counsel, that the injury to the plaintiffs' property, mentioned in the finding, might not arise from the obstruction of the street, but from making the way too easy to other parts of the city, or other cause too remote to constitute a ground of action. We can only infer from the finding of an injury, that it is what the law regards as an injury, such inference not being expressly contradicted by any statement in the case. Assuming, therefore, as we must from the case, that the defendants were about to construct a railroad along Broadway, in front of the plaintiffs' buildings, over lands to which they had no title, subject to the easement of the street; and that such railroad, when constructed, would be specially injurious to the plaintiffs' property, the right of the plaintiffs to a perpetual injunction to prevent such injury would appear to be free from doubt. Judge STORY, speaking

of private nuisances, which will·justify the interference of a court of equity, says: "There must be such an injury as from its nature is not susceptible of being adequately compensated by damages at law, or such as *from its continuance or permanent mischief, must be a constantly recurring grievance,* which cannot be otherwise prevented but by injunction." (2 Story's Eq., § 925.) In the case of *Williams* v. *The New York Central Railroad Company* (16 N. Y., 97, 111), which was a case similar to the present, except that the railroad had been built, and was in use, and damages were claimed for past injuries, as well as a perpetual injunction against their continuance, it was said, in the opinion of the court: "Although the plaintiff had a remedy at law for the trespass, yet as the trespass was of a continuous nature, he had a right to come into equity, and to invoke the restraining power to prevent a multiplicity of suits, and can, of course, recover his damages, as incidental to this equitable relief." The application in such cases is as appropriate to prevent the injury, where it is threatened, as to arrest it after it has commenced. (*Corning* v. *Lawrence,* 6 Johns. Ch., 439; Angel on Highways, § 283; 2 Story's Eq., §§ 825, 826, 924.)

It is insisted by the defendants' counsel, that the finding of the judge at the special term shows that the injury complained of was a public and not a private nuisance, and that, consequently, a private action to prevent or restrain it could not be maintained. It is not an available objection to actions of this nature, that the wrong complained of constitutes a public nuisance, provided the plaintiffs are subjected by it to any special injury, not common to the public, or to large classes of people. (*Doolittle* v. *Supervisors of Broome county,* 18 N. Y., 160; *Corning* v. *Lawrence,* 6 Johns. Ch., 439; 2 Story Eq., § 924; Waterman's Eden on Injunctions, 267, 268.) This principle is not controverted, but it is insisted that the finding that the railroad "will be specially injurious to the property of the plaintiffs, and other property similarly situated in the same part of Broadway," shows the case to be one of public nuisance only, without any special injury to the plaintiffs

that "the finding of a special injury to one, and to others similarly situated, is the finding of a common and like injury to all, and that such a common injury is a common or public nuisance." This is not a fair interpretation of the finding at the special term, and is entirely inadmissible under the liberal rule applicable to such cases, laid down in *Carman* v. *Pultz*, and *Grant* v. *Morse*, above referred to. The fair meaning of the language is, that the railroad would be specially injurious to the property of each of the plaintiffs in severalty, and in like manner specially injurious to the separate property of others similarly situated; that although the cause of the injury would be common, the special injury to each would be several and direct, and not merely consequential. This interpretation of the language in question, which is the natural and obvious one when it is read in connection with the other facts of the case, answers the objection of the defendants' counsel, and renders it unnecessary to examine particularly the numerous cases referred to on the argument. In none of them has it been held that an injunction to prevent a public nuisance could not be obtained by a private individual, suffering or likely to suffer a special injury from it not common to other people, under circumstances which would entitle the same person to an injunction if the nuisance were a private one merely. The judgment of the Supreme Court should be affirmed.

ROSEKRANS, J. It has been decided in this court that the common council of the city of New York had no power to pass the resolution under which the defendants were about to construct a railroad upon Broadway in that city. (4 Kern., 506.) In the case of *The People* v. *Kerr*, decided in this court in June, 1863, WRIGHT, J., delivering the opinion of the court, said that the power of governing and regulating the use of the streets in the city of New York is vested in the legislature; that it is a part of the governmental or political power of the State in no way held in subordination to the municipal corporation, and that if the legislature could not authorize the use of the streets for the purposes of a railroad, as prescribed

Milhau *v.* Sharp.

by the act of 1860, the power existed nowhere. It has also been decided in this court that the use of the streets in the city of New York, for the purpose of a railroad, is a new use, inconsistent with the original purpose of a street and with the public easement therein, and unless expressly authorized by law, creates a public nuisance; and that when such new use is threatened, an action to enjoin and restrain such use may be maintained by any owner of property on the street to whom such nuisance would be specially injurious. The fact was found in this case that the plaintiffs were severally owners and occupants of buildings fronting upon Broadway, and of the lots of land upon which such buildings are erected, and that the establishment of a railroad in that street will be specially injurious to the property of the plaintiffs and other property similarly situated. It is objected, on the part of the defendants, that this finding of fact is not sufficient to justify the interference of the court by injunction to restrain the defendants from building the road, for the reason that it shows that the injury is not peculiar to the plaintiffs, but is common to all. The reasonable construction of this finding is, that the injury to result from the threatened railroad will be specially injurious to the property of the plaintiffs in Broadway, and to other property on Broadway in front of which such railroad may be constructed. I do not understand that the injury referred to is such a common injury as will preclude the parties affected by it from claiming the interference of the court by injunction to restrain it. The rule, as laid down by Story, in his Equity Jurisprudence (vol. 2, § 924), is as follows: When private individuals suffer an injury quite distinct from that of the public in general, in consequence of a public nuisance, they will be entitled to an injunction, and relief in equity. The injury which the public in general would sustain by the erection of the nuisance would be the interference with their free enjoyment of the public easement. Such injury would be common to all the public. The injury to result to the owners of property upon the street along which the road was proposed to be constructed would be the

obstruction to the enjoyment of their property, thereby caus-
ing a depreciation in its value. This is the special injury
which the plaintiffs allege in their complaint. It is one pecu-
liar to the owners of property abutting upon the street, which
does not affect in the least the public in general. In *Corning*
v. *Lawrence* (6 Johns. Ch., 439), the chancellor sustained the
bill for an injunction to restrain the defendants from obstruct-
ing Vesey street, and distinguished the case from that of *The
Attorney General* v. *Utica Insurance Company* (2 Johns. Ch.,
371), saying that there was a special grievance to the plaintiff,
affecting the enjoyment of his property and the value of it.

It certainly would have been no objection to the granting
of relief to the plaintiff in that case that the property of a
number of other persons upon the same street, similarly
situated, was injured, and its value impaired by the same
cause. In *Lansing* v. *Smith* (4 Wend., 10), the chancellor held
that every individual who suffers actual damage, whether
direct or consequential, from a public nuisance, may maintain
an action for his own peculiar injury, although there may be
many others equally damnified.

To entitle a party to relief by injunction who is sustaining
or about to sustain a peculiar injury from a public nuisance,
it is also necessary that the injury should be such as cannot
be well or adequately compensated in damages at law, or such
as, from its continuance or permanent mischief, must occasion
a constantly recurring grievance, which cannot be otherwise
prevented but by injunction. The injury to the property of the
plaintiffs, to result from the unlawful act threatened by the de-
fendants, brings the case within the rule, in every particular.

It would be extremely difficult, if not absolutely impossible,
to determine the damages which the plaintiffs would sustain
upon each successive day that the railroad should be in opera-
tion. They could not be well or adequately compensated in
damages. But if this was not so, the case is clearly within
the last clause of the rule, by reason of the injury being con-
tinuous in its nature, and constantly recurring.

The judgment should be affirmed.

All the judges concurred for affirmance—EMOTT, J., putting his opinion as to the invalidity of the resolutions on the ground that the effect of the whole scheme was to create a corporation.

Judgment affirmed.