[712 NYS2d 8]

**5TH AVENUE CHOCOLATIERE, LTD., et al., Appellants, v 540 ACQUISITION CO., L. L. C., et al., Respondents.**

First Department, July 6, 2000

24

## APPEARANCES OF COUNSEL

*Kenneth J. Ashman* of counsel (*Ashman & Griffin,* attorneys), for appellants.

*Harry Steinberg* of counsel (*Abraham S. Altheim* on the brief; *Newman Fitch Altheim Myers, P. C.,* attorneys), for respondents.

## OPINION OF THE COURT

ELLERIN, J.

This case and the companion case of *532 Madison Ave. Gourmet Foods v Finlandia Ctr.* (271 AD2d 49 [decided herewith]) demonstrate the inappropriateness of rigidly extending a legal principle that had its genesis in contract law to a factual predicate that involves completely different juridical relationships.

While the facts and extent of the lack of care by defendants which gave rise to the harm suffered by plaintiffs are more fully and graphically detailed in Justice Mazzarelli's opinion in the companion case of *532 Madison Ave. Gourmet Foods (supra),* in which I join, a brief recital of the facts is helpful in shedding light on the nature of the relationships of the parties before us.

This proposed class action arises out of the street closure of a 15-block section of Madison Avenue, from 42nd Street to 57th Street, ordered by the City of New York on December 7, 1997, as a result of the collapse of a section of the wall of 540 Madison Avenue, a 39-story office building on Madison Avenue

and 55th Street, during the course of renovations undertaken by defendants, the owner, ground lessee and managing agent of the building. The two named plaintiffs, lessees of retail space in 510 Madison Avenue, located but a short distance from defendants' building, bring this action on behalf of themselves and all other business entities located within the area closed by the City, alleging that defendants knew or should have known, from either reviewing publicly available documents or inspecting 540 Madison Avenue itself, of long-standing serious problems and deficiencies in the wall where they undertook to punch 94 holes to install windows in a formerly windowless section. Although none of the plaintiffs or putative class members sustained any direct physical damage to their property, they are alleged to have suffered monetary damages consisting of lost profits for the period during which the street was closed and shoppers were unable to gain access to their stores. Plaintiffs ground their claims on theories of both nuisance and negligence.

■■ This brief recital of the facts demonstrates conduct by defendants which foreseeably gave rise to substantial harm to a finite class of merchants whose only relationship to defendants was their fortuitous geographic proximity to defendants' building. These merchants, without any fault or participation on their part, *and with a right to carry on their businesses free from the wrongful conduct of nearby property owners,* were subjected to the consequences of defendants' failure to maintain their building in a reasonably safe manner despite obvious notice of the overt risks and potentially deleterious consequences of their misconduct. In my view, these facts fall within the classic pattern giving rise to tort liability—i.e., that a wrongdoer is responsible for the natural and proximate consequences of its misconduct (*Ehrgott v Mayor of City of N. Y.*, 96 NY 264, 281)—and, therefore, at this stage of the action sufficiently state causes of action in both negligence and nuisance.

As to the negligence claim, defendants assert that they owed no duty to plaintiffs and that, in any event, no recovery would be permitted here because plaintiffs suffered only "economic loss" without any personal injury or other property damage. The classic formula for determining the scope of duty in negligence cases was delineated by Mr. Justice Cardozo in terms of the foreseeability of the harm caused to the particular plaintiffs seeking redress (*Palsgraf v Long Is. R. R. Co.*, 248 NY 339, 344 ["(t)he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to an-

other or to others within the range of apprehension"]). In recent years, the Court of Appeals has enunciated a more nuanced formula, stating that the "existence and scope of an alleged tortfeasor's duty * * * is a legal, policy-laden determination dependent on consideration of different forces, including logic, science, competing socioeconomic policies, and contractual assumptions of responsibility" (*Milliken & Co. v Consolidated Edison Co.*, 84 NY2d 469, 477). It is clear, however, that under either formula the owner of property has a duty to exercise reasonable care to maintain his property in a reasonably safe condition (*Klepper v Seymour House Corp.*, 246 NY 85, 94) and to prevent foreseeable injury to adjoining property (*see, e.g., Gayden v City of Rochester*, 148 AD2d 975).

Notwithstanding any such duties, defendants assert that there can in no event be liability in this situation because the only damages alleged are for economic losses. The "economic loss" rule was adopted by the Court of Appeals in *Schiavone Constr. Co. v Elgood Mayo Corp.* (56 NY2d 667, *revg on dissent in* 81 AD2d 221, 227-234). The facts and discussion in that case, as set forth in Mr. Justice Silverman's dissenting opinion, are particularly instructive. The immediate issue before the Court was the propriety of granting an attachment against the manufacturer of a product which turned upon resolution of the question of whether the purchaser of the product (a vehicular truck hoist) would have "a cause of action based on strict products liability as against a remote manufacturer who made no representations to plaintiffs, who has no privity of contract with plaintiffs, and where the only claim by plaintiffs is that the product failed to function properly, resulting in economic loss to plaintiffs" (at 228). It was concluded that, under such circumstances, it would be better not to extend strict products liability to this area but instead to "leav[e] the owner of the product to its remedy *based on its contract* with the seller, and likewise leav[e] the *seller* to its remedies against the person from whom it bought the equipment based upon the *contract* between those parties" (at 229 [emphasis added]). The discussion traces the historical genesis of the tort of strict products liability, its commercial and contractual nature and its interrelationship with the law of sales, emphasizing that the buyer of a product would have protective recourse, in the first instance, by way of warranties or salutary price arrangements to address purely economic damages stemming from the failure of the product to function in accordance with the buyer's expectations, as distinguished from physical injuries caused by the failure of the product to function safely (at 231-232).

■ As in *Schiavone*, the majority of cases enunciating the economic loss rule arise in the context of product liability, where the economic losses are essentially contractual in nature, and therefore the risk may be allocated by the parties, as reflected in the purchase price, UCC warranties or insurance (*see, e.g., Bocre Leasing Corp. v General Motors Corp.*, 84 NY2d 685, 688; *Bellevue S. Assocs. v HRH Constr. Corp.*, 78 NY2d 282). It is difficult to transpose that rationale to the factual pattern before us, where the alleged negligence, of the owners of a high-rise office building abutting on a public sidewalk in a densely populated business area causes economic injury to nearby merchants who have entered into no relationship, contractual or otherwise, with the owners, but who should have a right to carry on their own businesses without suffering damage by reason of the other's wrong. Since the contractual, commercial rationale underlying the economic loss rule is wholly lacking in this setting, there is no reason to strain to extend that rule to ordinary negligence cases such as this.

Indeed, the discomfort in applying the economic loss rule in a traditional negligence context is demonstrated by the decision in *Dunlop Tire & Rubber Corp. v FMC Corp.* (53 AD2d 150). In that case, an explosion at the defendant's manufacturing plant cast stones and debris upon the plaintiff's factory and also destroyed towers and distribution lines owned by the local power company supplying the plaintiff's factory, causing a 24-hour shutdown of the factory. The Fourth Department permitted recovery for $170,000 in lost profits resulting from the shutdown occasioned by the loss of energy in addition to the physical damage, which totaled only $16,445. With respect to the physical damage, the Court noted that the plaintiff was within the zone of foreseeable danger, in that plaintiff's property was located near the defendant's, in a highly industrialized section of town, and the defendant was engaged in the business of manufacturing chemicals which it knew from prior experience posed a threat of explosion (*supra,* at 152). The Court went on to hold that "defendant's duty and the foreseeability of harm to plaintiff was no less because part of the damage occurred as a result of the destruction of power lines rather than directly by concussion and flying objects, *because the injury to plaintiff came from the same physical force* (the explosion of stored chemicals) *which required the exercise of care towards it generally*" (*supra,* at 154 [emphasis added]).

It is apparent from the facts in *Dunlop Tire* (*supra*) that the economic damage so far outweighed the physical damage that

the latter was merely utilized as a vehicle for redressing the much more serious former. Similarly, in *Syracuse Cablesystems v Niagara Mohawk Power Corp.* (173 AD2d 138, 140), defendant power company's transformer exploded and leaked contaminating chemicals into the adjacent building, causing physical damage to clothing, office supplies and equipment, as well as lost profits and business expenses, including employee wages and overtime and additional advertising, as a result of the plaintiffs' inability to use their offices for almost one month. The Fourth Department held: "The risk of an explosion in the transformer and the consequent danger of PCB contamination to the building was foreseeable. Moreover, here as in *Dunlop* (*supra*), the plaintiffs allegedly suffered property damage, which, although constituting only a small portion of the total damages sought, was caused by an accidental explosion which rendered plaintiffs' property unusable for an extended period of time" (*supra*, at 142).

Apparently acknowledging the difficulty presented in the arbitrariness of predicating recovery of economic losses on property damage which may be minuscule, at least in relative terms, the Fourth Department emphasized the nature of the wrong—i.e., an accidental explosion. Indeed, the Fourth Department noted that: "[i]n determining whether the *Schiavone* rule applies, the factors to consider are the nature of the defect, the injury, the manner in which the injury occurred and the damages sought" (*supra*, at 142). In other words, traditional principles of tort law should govern.

These cases demonstrate the irony of a rule that posits the right to recover economic losses, no matter how great, upon the fortuitous occurrence of some concomitant physical damage, no matter how slight. The general purposes of tort law, to hold responsible those who cause socially unreasonable injuries and to deter similar conduct, as well as to compensate wronged persons (Prosser and Keeton, Torts, at 1-6 [5th ed]), are undermined by an arbitrary formula that has the effect of holding to a lower standard those whose negligence causes only nonphysical damage, which, as in the instant case, is often more ruinous than physical property damage.

However, recognition must also be accorded to the fact that there must be some mechanism in place to prevent uncontrolled liability. Relying solely on foreseeability to define the extent of liability, while generally effective, could result in some instances in liability so great that, as a matter of policy, courts would be reluctant to impose it. It is helpful in that regard to

look to the manner in which the issue has been addressed in some other jurisdictions.

In *J'Aire Corp. v Gregory* (24 Cal 3d 799, 598 P2d 60), the California court sought to go beyond an arbitrary cutoff of liability without opening the floodgates of uncontrolled liability and thus held that negligent interference with prospective economic advantage would be limited to instances where the risk of harm was foreseeable and was closely connected with the defendant's conduct, where damages were not wholly speculative, and where the injury was not part of the plaintiff's ordinary business risk.

I agree with Justice Mazzarelli that the clearest and most thoughtfully elaborated approach is that taken by the Supreme Court of New Jersey in *People Express Airlines v Consolidated Rail Corp.* (100 NJ 246, 495 A2d 107),[1] which admirably addresses the potential problem of excessive liability for economic losses in the context of a modern, intricately interconnected commercial setting by adapting the traditional common-law approach in a number of ways, including increasing the required level of foreseeability to "particularly foreseeable." This is a far better method than to arbitrarily cut off any responsibility whatsoever simply because the plaintiffs unfortunately failed to suffer some physical damage along with their economic losses.

In *People Express (supra)*, the court stressed that when this type of recovery is sought, an identifiable class of plaintiffs is not necessarily identical to a foreseeable class of plaintiffs. Instead, it must be "particularly foreseeable" in terms of the types of persons or entities comprising the class, the certainty or predictability of their presence, the approximate numbers of those in the class, as well as the type of economic expectations disrupted. The court there held that a commercial airline, which was forced to evacuate its terminal for 12 hours because of the risk of explosion of a nearby burning tank car, had stated a cause of action for economic loss that had been incurred because of the cancellation of scheduled flights, the loss of reservations for future travel and the payment of certain fixed operating expenses allocable to the evacuation time period which were necessarily incurred and paid despite the fact that the airline's offices were closed.

---

1. As indicated in Justice Mazzarelli's opinion in the companion case (271 AD2d, *supra*, at 55, n 3), *People Express* and its philosophic underpinnings regarding the recovery of economic damages in tort cases have been favorably cited in *Blue Cross & Blue Shield v Philip Morris, Inc.* (36 F Supp 2d 560, 583 [ED NY]) and followed in various other States.

Relying on the same principles, the Supreme Court of Alaska held in *Mattingly v Sheldon Jackson Coll.* (743 P2d 356 [Alaska]) that a plumbing contractor who alleged that he lost business as a result of being deprived of the services of several employees, who were injured while working in a trench negligently dug by the defendant that collapsed, had set forth a cause of action for negligently caused economic loss (*see also, Watson Co. v Lone Star Serv. Sta.*, 16 SW2d 151 [Ct Civ App, Tex]).

These cases demonstrate that it is possible to limit liability for economic losses to governable levels while still holding negligent actors liable for the most predictable results of their *wrongful conduct*. Defendants should only be held liable for the financial losses of those businesses in such close proximity that their negligent acts could be reasonably foreseen to cause injury. In this case, based on the allegations in the complaint, the two named plaintiffs have sufficiently pleaded facts as to the foreseeability of their injuries, even within the strictures imposed by the court in *People Express* (*supra*).

Plaintiffs' allegations set forth that they were particularly foreseeable victims of the type of harm caused by the building collapse since, as close-by neighbors of the high-rise structure, in the intensely crowded urban environment involved, the negligent renovation of the wall leading to its collapse was particularly likely to cause the closure of the surrounding areas of Madison Avenue, thereby causing loss of trade to retailers in the area who relied on street traffic for their business. Therefore, to the extent the complaint factually relates to plaintiffs themselves, the pleading is sufficient to warrant reinstatement of their cause of action in negligence.

■ Moreover, I believe their pleading also sufficiently states a cause of action in nuisance. A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all * * * in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons" (*Copart Indus. v Consolidated Edison Co.*, 41 NY2d 564, 568 [citation omitted]). However, in order to maintain a private cause of action for a public nuisance, a plaintiff must also demonstrate a "special" or "peculiar" injury, that is, a harm of a different kind from that suffered by other persons exercising the same public right (*Burns Jackson Miller Summit & Spitzer v Lindner*, 59 NY2d 314, 334). Thus, when the

claimed injury is " 'common to the entire community,' " a private right of action is barred (*supra,* at 334-335). Nevertheless, as was early aptly stated, "[t]he idea * * * that if by the same act numbers are so injured no recovery can be had by anyone, is absurd * * * [and no] matter how numerous the persons may be who have sustained this peculiar damage, each is entitled to compensation for his injury" (*Francis v Schoellkopf*, 53 NY 152, 154-155).

In *Burns Jackson* (*supra*), strongly relied upon by the IAS Court in dismissing the instant claim, two law firms sought damages for increased expenses and lost profits resulting from a subway strike. In dismissing the cause of action for public nuisance, the Court of Appeals noted that such damages, "though differing as to the nature of the expense or the particular contract from which greater profit was expected, were * * * suffered by every person, firm and corporation conducting his or its business or profession in the City of New York" (*Burns Jackson Miller Summit & Spitzer v Lindner*, 59 NY2d, at 334). A City-wide subway strike affecting millions of the City's residents is quite different from retail merchants in the limited geographic area here involved.

More comparable is *Leo v General Elec. Co.* (145 AD2d 291, 294), where the Second Department permitted commercial fishermen to maintain a cause of action for public nuisance where pollution of public waters of the Hudson River and waters off Long Island contaminated striped bass fish, since the commercial fishermen derived a substantial portion of their income from the sale of those fish, and therefore suffered a special harm which went beyond that suffered by the community at large.

Similarly, in *Farmer v D'Agostino Supermarkets* (144 Misc 2d 631, 636), the court permitted homeless people to maintain an action against various stores which allegedly refused to redeem 240 returnable cans and bottles per day, as required by statute, since the homeless people depended on container gathering for their livelihood, and therefore suffered a unique harm, different from that of members of the general public, who "return containers casually, simply to recover the refund value."

Just as commercial fishermen derive a significant portion of their income from public waters and homeless people from collecting cans, so, too, retailers' earnings are particularly affected by pedestrian traffic, especially during the holiday shopping season, the time of the instant street closure. Indeed, as

the Court of Appeals has noted: "[I]n a populous city, whatever unlawfully turns the tide of travel from the sidewalk directly in front of a retail store to the opposite side of the street is presumed to cause special damage to the proprietor of that store, because diversion of trade inevitably follows diversion of travel" (*Flynn v Taylor*, 127 NY 596, 600). Under such circumstances, that the retailers "suffered some special damage not common to persons merely using the street for passage is too obvious for reasonable dispute" (*Callanan v Gilman*, 107 NY 360, 371). Thus, in *Broad Exch. Co. v Curb Stock & Bond Mkt.* (117 Misc 82), the court allowed a public nuisance claim by numerous owners of valuable lands and buildings on Broad Street, between Exchange Place and Beaver Street, a 465-foot-long block, whose tenants complained of obstructions caused by the defendant's operation of a stock exchange in the street, thereby isolating the properties from other sections of the financial district, making it more difficult to rent the properties and depressing the rental value.

While the affected area in the instant case is larger than the obstructed section in *Broad Exch. Co.* (*supra*), it is still a readily ascertainable and geographically restricted region (*compare, Hoover v Durkee*, 212 AD2d 839, 840 [resident neighbors within five-mile radius suffered special damages from noise levels emanating from raceway], *with Queens County Bus. Alliance v New York Racing Assn.*, 98 AD2d 743 [plaintiffs suffered no damages different from other residents and merchants of Queens County]). Moreover, the named plaintiffs, two retail merchants, suffered a substantial loss of income due to the inability of patrons to gain access to their stores during the most important shopping season of the year, which injury is quite different from that suffered by other members of the community, that is, the *inconvenience* of not being able to traverse the streets by foot or car. Therefore, the IAS Court erred in characterizing the merchants in the defined area as the community-at-large.[2] Those two combined factors, limited geographic area and significant pecuniary losses not suffered by others, support a cause of action sounding in public nuisance.

Where multiple plaintiffs are involved, the injury, though "common" to them, must be several and direct to each in order to support a claim for public nuisance (*Milhau v Sharp*, 27 NY

---

2. To the extent the complaint is purportedly brought on behalf of "all other business entities," the factual allegations concerning damages are limited to retailers which depend on foot traffic for sales.

611, 626). That individual issues of damages may sharply vary or that issues concerning plaintiffs located closer to the collapsed building may differ substantially from those situated at the outskirts of the closed section would appear to militate against a class action (*see*, CPLR 901). However, we need not address that matter at this juncture, either with respect to the nuisance or the negligence claims, since plaintiffs have not moved for class certification, as required by CPLR 902, and the record currently before this Court is insufficient to determine that issue. Nevertheless, whether ultimately permitted to be prosecuted as a class action or multiple individual suits, at this stage of the proceedings, a cause of action for public nuisance *by the two named plaintiffs* has been stated.

In accordance with the foregoing, the order of the Supreme Court, New York County (Sheila Abdus-Salaam, J.), entered October 14, 1998, granting defendants' motion pursuant to CPLR 3211 (a) (7) to dismiss the complaint, should be reversed, on the law, without costs, the motion denied with respect to the causes of action for negligence and nuisance and those causes of action reinstated.

ANDRIAS, J. (dissenting). We would affirm the dismissal of the complaint for failure to state a cause of action.

In this action arising out of the closing, by order of the City of New York, of a section of Madison Avenue during the 1997 Christmas shopping season due to the partial collapse of the southern facade of a 39-story office building at 540 Madison Avenue, plaintiffs, purporting to represent a class of nearby businesses which allegedly suffered economic loss in the form of lost profits, make claims of negligence, gross negligence, negligence per se, public nuisance, private nuisance and strict liability against the owner, ground lessee and managing agent of the building. The IAS Court dismissed the negligence causes of action on the ground that the connection between defendants' alleged negligence in renovating their premises and plaintiffs' alleged damages for economic losses without accompanying property damage is too tenuous and remote to permit recovery, citing, *inter alia*, *Beck v FMC Corp.* (53 AD2d 118, 121-122, *affd on opn at App Div* 42 NY2d 1027) and *Petitions of Kinsman Tr. Co.* (388 F2d 821, 824). We agree.

The IAS Court drew the appropriate line "between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit" (*De Angelis v Lutheran Med. Ctr.*,

58 NY2d 1053, 1055). "[T]he economic and social burden that would be placed on defendants, for purely financial losses as sustained here, would expand the orbit of duty to an uncontrollable degree and extend liability to a point totally disproportionate to the fault found." (*Schneider Natl. v State of New York*, 138 Misc 2d 205, 210-211.)

A defendant may be held liable for negligence only when it breaches a duty owed to the plaintiff (*Pulka v Edelman*, 40 NY2d 781, 782). Such duty "is defined neither by foreseeability of injury * * * nor by privity of contract * * * [And] while the absence of privity does not foreclose recognition of a duty, it is still the responsibility of courts, in fixing the orbit of duty, 'to limit the legal consequences of wrongs to a controllable degree' * * * and to protect against crushing exposure to liability * * * 'In fixing the bounds of that duty, not only logic and science, but policy play an important role' * * *. The courts' definition of an orbit of duty based on public policy may at times result in the exclusion of some who might otherwise have recovered for losses or injuries if traditional tort principles had been applied" (*Strauss v Belle Realty Co.*, 65 NY2d 399, 402-403 [citations omitted]). The better rule is the long-standing "economic loss" rule, which bars recovery for solely economic damage absent personal injury or property damage.

The majority, while recognizing that plaintiffs have no relationship, contractual or otherwise, with defendants, would, nevertheless, expand defendants' orbit of duty to encompass, in the companion case of *532 Madison Ave. Gourmet Foods v Finlandia Ctr.* (271 AD2d 49 [decided herewith]), a shopkeeper located half a block from defendants' premises, and, in this case, two stores located about two blocks away which sue on their own behalf as well as on behalf of all similarly situated shopkeepers within a 15-block area bounded by 42nd and 57th Streets and Park and Fifth Avenues. In so doing, it strongly relies upon a 15-year-old decision of the New Jersey Supreme Court, *People Express Airlines v Consolidated Rail Corp.* (100 NJ 246, 495 A2d 107 [NJ Sup Ct 1985]), which, in the 15 years since it was decided, has never been cited, let alone followed, by a New York State court, and which admittedly departed from a longstanding body of American and British law holding that, absent a duty or relationship between the parties and in the absence of both privity and personal injury or property damage, mere economic loss is insufficient to cast defendants in tort liability.

*People Express Airlines v Consolidated Rail Corp.* (*supra*) is readily distinguishable on its facts. That decision permitted

the plaintiff airline to pursue an action for alleged economic damage caused by defendant's alleged negligence associated with a fire caused when ethylene oxide escaped from a punctured tank car in defendant's freight yard, which was adjacent to plaintiff's airport terminal. The municipal authorities, fearing an explosion, evacuated the area within a one-mile radius and, although the feared explosion never occurred, plaintiff's employees were prohibited from using the terminal for 12 hours. Among the facts that persuaded the court that a cause of action for economic loss had been established was "the close proximity of the North Terminal and People Express Airlines to the Conrail freight yard; the obvious nature of the plaintiff's operations and particular foreseeability of economic losses resulting from an accident and evacuation; the defendants' actual or constructive knowledge of the volatile properties of ethylene oxide; and the existence of an emergency response plan prepared by some of the defendants (alluded to in the course of oral argument), which apparently called for the nearby area to be evacuated to avoid the risk of harm in case of an explosion" (*supra*, 100 NJ, at 267-268, 495 A2d, at 118).

Although recognized as a departure from the established doctrine that recovery for solely economic damages is limited to those instances where defendant's negligence has caused personal injury or property damage, *People Express* is really more akin to cases such as *Syracuse Cablesystems v Niagara Mohawk Power Corp.* (173 AD2d 138), where the interruption of plaintiff's business operations was found to be foreseeable and the lost profits and related business expenses resulting from the interruption compensable after defendant's electrical transformer exploded, causing physical damage and economic loss to plaintiff's adjacent building, which was shut down due to consequent danger of PCB contamination; and *Commonwealth v General Pub. Util. Corp.* (710 F2d 117 [Three Mile Island]) where, although there were no claims of physical injury or property damage, there was a claim of temporary loss of use of property and "damage to property" as a result of the intrusion of radioactive materials upon plaintiffs' properties through the ambient air, irrespective of any causally related permanent physical harm to property.

Similarly, in *Dunlop Tire & Rubber Corp. v FMC Corp.* (53 AD2d 150), the plaintiff was found to be within the zone of foreseeable danger since its tire plant was located across the railroad tracks from the defendant's chemical manufacturing plant and the explosion, which was not the first experienced by

the defendant, occurred less than 1,200 feet from the plaintiff's tire factory, casting stones and debris on the tire factory and damaging it by concussion as well as destroying the power lines servicing the plaintiff's plant, thus causing a 24-hour shutdown of plaintiff's factory. In permitting the plaintiff to proceed with its claims for lost profits, the Fourth Department held that the plaintiff's rights arose from an independent duty of care owed to it by the defendant to protect it against a predictable risk.

The majority's discussion and distinction of the *Dunlop Tire* and *Syracuse Cablesystems* cases is interesting inasmuch as plaintiffs strongly rely upon both cases for the proposition that where there is no contractual remedy, the "economic loss" rule does not apply. However, *Dunlop Tire* and *Syracuse Cablesystems* clearly required property damage as a prerequisite to any recovery for economic loss. This distinction is readily apparent in *Beck v FMC Corp. (supra)*, relied upon by the IAS Court, which resulted from the same explosion as *Dunlop Tire* and was decided by the Fourth Department on the same day. In *Beck*, where the explosion caused no property damage but resulted in the loss of electric power to the Chevrolet plant where they worked, the plaintiffs were denied recovery for loss of a day's wages attributable to the resulting closing down of production. The Court refused to broaden the range of duty and, therefore, of liability of one charged with unintentional tortious conduct or with maintaining a nuisance, in order to create a new cause of action, independent of direct physical injury, for lost wages by employees of a third party in those circumstances. The Court stated: "Judicial sanction of the causes of action pleaded here would make it nearly impossible to guard against unlimited or unduly burdensome liability and avoid arbitrary distinctions in defining the areas of liability" (53 AD2d, at 122).

Clearly, without a legally cognizable relationship and without physical injury or property damage, mere economic loss is not recoverable in tort. As noted by the Court in *Hemming v Certainteed Corporation* (97 AD2d 976, *appeal dismissed* 61 NY2d 758), the "economic loss" rule enunciated in *Schiavone Constr. Co. v Elgood Mayo Corp.* (56 NY2d 667, *revg* 81 AD2d 221 *on dissenting opn of Silverman, J.*) applies equally to negligence and strict liability causes of action and so-called "economic loss" claims are relegated to the law of contracts and warranty. Nor do we agree with the majority's contention that it is apparent from the facts in *Dunlop* that the economic dam-

age so far outweighed the physical damage that the latter was merely used as a vehicle for redressing the much more serious former.

The other cases relied upon by the majority are likewise distinguishable on the applicable law or their particular facts, which are limited for the most part to instances of adjacent landowners who suffer property damage and/or economic loss as a result of the foreseeable effect of defendant's alleged negligence.

Plaintiffs' nuisance claims, which are premised on the same theory as the negligence causes of action, were also properly dismissed (see, Copart Indus. v Consolidated Edison Co., 41 NY2d 564, 569; Aversa v Garlain Realty, 247 AD2d 420). There is no evidence of a special relationship between plaintiffs and defendants. Rather, the record supports the conclusion that plaintiffs' relationship was the same as that of every other property owner in the area affected by the temporary closure of Madison Avenue. Indeed, the class described in the amended complaint illustrates the enormous scope of liability sought to be imposed, i.e., "all other business entities, in whatever form," located in the area from 42nd Street to 57th Street bounded by Fifth Avenue and Park Avenue. Even in the companion appeal, where the plaintiff gourmet shop is located only half a block away, the question arises: where do we draw the line of liability?

Just as in Milliken & Co. v Consolidated Edison Co. (84 NY2d 469), the locale and time of year in which the injuries occur (the "Garment Center" during "Buyers Week") are distinctions "without a legal, public policy-rooted difference because, regardless of the situs, the same unlimited, undefined class of potential plaintiffs is implicated" (supra, at 478). It is also well settled that, where economic loss results from business interruption, "speculative lost profits, lost revenues or lost labor productivity" are not recoverable (Grow Tunneling Corp. v Consolidated Edison Co., 157 AD2d 452).

MAZZARELLI, J. P., and RUBIN, J., concur with ELLERIN, J.; ANDRIAS and BUCKLEY, JJ., dissent in a separate opinion by ANDRIAS, J.

Order, Supreme Court, New York County, entered October 14, 1998, reversed, on the law, without costs, and defendants' motion pursuant to CPLR 3211 (a) (7) to dismiss the complaint denied with respect to the causes of action for negligence and nuisance and those causes of action reinstated.